**Margo L. MORRIS, Plaintiff,**

v.

**THE BOARD OF EDUCATION OF THE LAUREL SCHOOL DISTRICT et al., Defendants.**

**Civ. A. No. 4684.**

United States District Court,
D. Delaware.

Aug. 4, 1975.

Jacob Kreshtool, and Sheldon N. Sandler, Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiff.

John E. Messick, Tunnell & Raysor, Georgetown, Del., for defendants.

## OPINION

STAPLETON, District Judge:

Margo Morris, a school teacher formerly employed by the Laurel School District, alleges in this action that the District's failure to rehire her for a fourth year violated her rights under the Civil Rights Act, under a collective bargaining agreement, and under the Due Process Clause of the Fourteenth Amendment.

## I. THE FACTS

Laurel, Delaware, is a small community located in the southernmost part of the state. The Laurel School District serves the town and the surrounding rural area. Its affairs are administered by an elective school board whose members receive no monetary compensation. The chief administrator of the District is the Superintendent, Mr. Hupp. The District's schools were desegregated in the mid-60's.

Miss Morris, who is black, was hired by the Laurel School District in the Summer of 1970 and subsequently taught in the District for three school

years, 1970–71, 1971–72 and 1972–73. She had previously taught in Wycomico County, Maryland. She left her position there because she had been teaching elementary children—which she was not certified to do—and because she was unable to coach there. In the Laurel District she taught physical education and health and coached a number of teams including the girls' varsity basketball team.

During Miss Morris' first two years in the Laurel District, she taught in the combined junior and senior high school where her principal was Mr. Harrington. Mr. Harrington evaluated Miss Morris' teaching performance during these two years as average and better than average. Miss Morris' performance as a coach also appears to have been satisfactory. In her first year, the girls' basketball team came in second in its division and, in her second year, the team won the division championship and played in the conference championship game.

The District's personnel file on Miss Morris, in contrast to those of a number of other teachers associated with the athletic program, bears no evidence of complaints about her performance either as teacher or coach during the first two years. Nor did the evidence at trial reveal any serious problems during this period. Only one episode described at trial warrants mention in light of subsequent events. During March of 1971, after the basketball season had ended, Miss Morris began dating Kenneth Long. Mr. Long who is also black, attended a number of basketball games during the 1971–72 season and usually sat in the stands. At the conference championship game in Milford, however, Mr. Long sat on the bench beside Miss Morris and both Mr. Harrington and Mr. Hupp observed this.[1] Both thought it inappropriate for a non-coach to be sitting on the bench during a game,[2] and Mr. Harrington mentioned this to Miss Morris at her spring evaluation shortly after the championship game. Thereafter, Mr. Long did not sit on the bench during any games.[3]

Non-tenured teachers in the Laurel District are employed pursuant to ten-month contracts, running from September through June. In March or April of each year, the Laurel School Board discusses the question of contract renewals. To assist in making decisions on renewal, the Board members receive recommendations from Mr. Hupp, who in turn receives recommendations from his subordinates. In the Spring of 1972, Mr. Harrington recommended Miss Morris'

1. Mr. Hupp testified that he also observed lack of "bench control" at the championship game but it is fair to say that any deficiency which may have existed in this regard was not considered serious at the time. Mr. Harrington did not mention bench control as an area of concern at the spring evaluation, see text *infra*, and Mr. Hupp did not cause any dissatisfaction he may have had to be followed up with Miss Morris during the remainder of that school year.

2. Miss Morris had not been previously instructed about who was to be allowed on the bench and the rules of the Delaware Secondary Schools Athletic Association do not expressly cover the subject. The rules do, however, prohibit coaching by a non-teacher and Mr. Harrington was justifiably concerned lest Mr. Long's presence be misconstrued.

3. Three other deficiencies were mentioned at trial but the Court is persuaded that they played no part in the decision not to renew Miss Morris' teaching contract for the 1973–74 school year. Mr. Harrington spoke with Miss Morris about a small indebtedness to W. T. Grant which she had not paid. In addition, in her first year Miss Morris did not have the basketball uniforms cleaned until the end of the softball season. This appears to have been the result of a failure of communication. Finally, towards the end of the 1971–72 school year, a problem arose regarding the sale of physical education uniforms. The other teacher involved in the coaching of girls' athletics took the major blame for the failure to have the girls promptly pay for the uniforms they had purchased and Miss Morris agreed to pay one-third of the collection deficiency since she was also involved in the physical education program. Mr. Hupp agreed that the situation was resolved amicably.

reemployment for the coming year without reservation. Mr. Hupp recommended reemployment to the Board. While some of those present at the meeting now claim to have a vague recollection that Mr. Hupp expressed some reservation about his recommendation and mentioned insubordination, the record shows that Mr. Hupp would have had no basis for such an assertion and, for this reason, I conclude that Mr. Hupp did not qualify his recommendation. The Board renewed Miss Morris' contract for the 1972–73 school year.

The 1972–73 school year was one of transition for the Laurel School District. The District was reorganized, thanks to the construction of a new facility. This new building housed the Senior High School and the combined Junior-Senior High School building of prior years became the Laurel Central Middle School. Miss Morris was assigned as a teacher to the Middle School. Her principal there was Mr. Dodson. Mr. Harrington was assigned to be principal of the Senior High. During the transition, Mr. Harrington reviewed with Mr. Dodson a list of teachers at the Middle School who had manifested deficiencies. Miss Morris' name was not on this list.

Miss Morris' teaching during the 1972–73 school year appears to have been uneventful and entirely consistent, in terms of performance, with her first two years. Mr. Dodson evaluated her as an "above average teacher" and recommended that she be rehired for the 1973–74 school year. Mr. Harrington, who also had a supervisory position with respect to Miss Morris that year by virtue of the fact that she was coaching senior high athletics, testified at trial that the "rapport" between them was "good".[4] Miss Morris was always courteous in her dealings with him, and exhibited a willingness to "spend extra time at the school doing things she was asked to do."[5]

Unfortunately, Miss Morris' experience as a coach during the 1972–73 school year did not prove to be as uneventful as her experience teaching.

Senior high school basketball practice started in mid-November at the new high school.[6] The new bleachers had not arrived, however, and the coaches promptly expressed a desire to move to the middle school for practice so that the team members would have the advantages of practicing on the court where they would play their games. At this time, Miss Morris was still seeing Kenneth Long. He would drop her at school in the morning and return towards the end of the day to pick her up. On at least one occasion prior to November 29, 1972 he came into the middle school building and watched the end of basketball practice while waiting for Miss Morris to complete her duties. Parents frequently did the same thing while waiting for their children to finish practice.

Prior to November 29, 1972, no one had told Miss Morris that visitors were not to be permitted at practice. On that day, however, Mr. Harrington wrote Miss Morris a memorandum. He was motivated in doing so by two things: Miss Morris had not previously been given instruction with respect to the security precautions to be taken in the new building and he had heard from

4. T. 688.

5. T. 708.

6. On August 28, 1972, a meeting of coaches and administrators was held to discuss the athletic program for the coming year. Mr. Harrington had recommended that someone who was on the teaching staff at the senior high school coach varsity basketball because he felt that, to the extent possible, varsity coaches should be teaching on the staff of the high school. Based upon this recommendation, Miss Morris was asked if she would be willing to coach at the middle school. The other coach of girls' athletics did not like to coach varsity basketball, however, and refused to undertake this responsibility for the coming year. The matter was, accordingly, dropped. There was no criticism of Miss Morris' performance as a coach at this meeting.

the other female physical education instructor that Miss Morris' boyfriend had been attending practices. The subject of the memorandum was "Building Usage." Most of it dealt with securing the building at the end of the day and with confining the students to the gym-locker room area after school hours. The memorandum concluded, however, with the following directive:

> There is to be no one admitted to the building during practice sessions except the coaches, players, or other staff members.

Mr. Harrington intended, and Miss Morris understood, that this included Kenneth Long.

While, after November 29, 1972, Mr. Long continued to attend basketball *games*, there is no persuasive evidence in the record that Mr. Long attended another basketball practice prior to February 19, 1973. By contrast, it appears that—with the knowledge of the administration—the broad policy expressed in the Harrington memorandum was frequently violated during the winter months by parents and recent graduates.

During the 1972–73 season, Miss Morris' basketball team compiled an enviable record. By January or early February, however, a number of rumors and complaints about Miss Morris were circulating around the community. There were, of course, the inevitable complaints of parents who could not understand why their daughters did not play more. Beyond this, however, there were allegations that Miss Morris discriminated in favor of black players. Also, it was rumored that Miss Morris was "associating with this boy who appeared somewhat drunk, but there was never any odor of alcohol." [7]

On February 19th, Mr. Long went to pick up Miss Morris and was admitted to the building by the janitor. He stood and observed the remainder of the girls'

basketball practice. That evening Mr. Harrington received a telephone call from the mother of one of the girls on the team complaining that Miss Morris' boyfriend had been at practice and appeared to be under the influence of something. Mr. Harrington communicated this complaint to Miss Morris on February 20, and reminded her of his instruction that no visitors be permitted at practices. Miss Morris acknowledged that her boyfriend had been present the previous day but denied that he was under the influence of anything.

In addition to talking with Miss Morris, Mr. Harrington relayed the parent's complaint to Mr. Hupp who called a meeting for the following day. At the meeting Mr. Hupp and Mr. Harrington discussed with Miss Morris both recent complaints and certain "rumors". Among the matters discussed were whether Miss Morris had allowed a black girl to practice without gym shoes, whether she had started Debbie West, a black girl, after she had not shown up for practice, why Miss Morris had brought two black girls up from the junior varsity team after two injuries, instead of utilizing white "bench warmers", and whether she had permitted Vera Horsey, another black girl, to act in a coaching capacity. Miss Morris denied that she had allowed any players to coach, but acknowledged having allowed one girl to practice without shoes.[8] Miss Morris further indicated that Debbie West had attended practice even though her participation had been limited by injury, and explained the thought behind her selection of players. There was no indication that either Mr. Hupp or Mr. Harrington was dissatisfied with these explanations. The conference was an amicable one. Hupp and Harrington were understandably concerned about the appearance of racial discrimination in Miss Morris' coaching and wanted to help her improve her relationships with

---

7. T. 124, 305.

8. She was advised that funds were available to assist students unable to afford equipment.

parents. Hupp suggested that she speak with the parents of the "bench warmers" to explain her player selection. Miss Morris was reluctant at first, but agreed to do so.

Within a few days following this February 21, 1973 conference, the Laurel's girl team played the Milford, Delaware, team for the conference championship. The game was attended by Robert Mitchell, a staff captain with the Delaware State Police, who lived in Laurel and who had a daughter on the team. His daughter, Judi, had started at every game during the regular season but did not play in the Milford game. Immediately after the game—won by Laurel Captain Mitchell sought out Mr. Harrington and demanded a conference with Mr. Hupp. He wanted an explanation as to why his daughter had not started when she had started all of the other games.

The requested conference was arranged and Miss Morris met with Mitchell, Harrington and Hupp in Hupp's office on February 26, 1973. Captain Mitchell demanded an explanation. He felt that Miss Morris had not played his daughter because she thought Judi was responsible for the complaint about her boyfriend. Miss Morris explained that she had not played Judi because she needed additional rebounding strength. Mr. Hupp told Captain Mitchell that the coach had to have the prerogative of playing the members of the team as she saw fit. Mitchell was not satisfied, however. He announced that Judi had quit the team. After Mitchell left, Hupp told Miss Morris that Mitchell had asked him to fire her because of her conduct and that he (Hupp) had responded that he had no reason to fire her.

Immediately after the Mitchell conference, there was a meeting with the parents of Sheila Fuller who, it turned out, had also resigned from the team. The Fullers were concerned about the fact that their daughter had not played much during the season and also felt that Sheila might be being blamed for the boyfriend complaint. Unlike Captain Mitchell, the Fullers were satisfied with Miss Morris' explanation of her choice of players.

After this conference, Mr. Harrington suggested that Miss Morris talk to the Mitchell and Fuller girls and try to persuade them to return to the team for the state championship game with Lake Forest that evening. Miss Morris was "anxious to do so" and the two of them sat down with Judi Mitchell later that day. According to Mr. Harrington, Miss Morris did a "good job" in trying to convince Judi to come back but the result of the conference was inconclusive. Later in the day, Miss Morris met alone with Sheila Fuller.

Earlier, Mr. Hupp had spoken to Mr. Harrington alone and had suggested that Mr. Harrington speak individually to the members of the team during the course of the afternoon to determine whether Long had been under the influence at practice, whether Miss Morris had quizzed the members of the team about the source of the boyfriend complaint, and whether the team members felt that any of them were treated differently than others.

Mr. Harrington found a marked difference of opinion among the team members. At trial, he described the results of his inquiry as "inconclusive". He provided a copy of the results to Miss Morris along with a memo indicating that he did not think she had been entirely candid with him on the subject of her inquiries of team members regarding the source of the complaint about Mr. Long. The memo concluded, however, with the following statement:

> As for the student comment, I feel that if you would give these comments the consideration they deserve it would improve your coaching.

Significantly, Mr. Harrington testified at trial that he wrote this because he had no reason to believe, as of February

26, 1973, that Miss Morris would not be back the following year.[9]

Following the February 26, 1973 conference, Captain Mitchell undertook a different type of investigation. The Drug Unit of the Delaware State Police was under his command. Without the knowledge of any member of the school administration or school board, he undertook to find out who the boyfriend was and if he was on drugs. He assigned a state police sergeant to determine where the boy lived. The sergeant located Long in Salisbury, Maryland. Mitchell and the sergeant started surveillance in Salisbury at 5:30 A.M. the next morning. They observed Miss Morris and Long emerge from Miss Morris' residence and proceed to Peninsula General Hospital. From there they went to Laurel where Long dropped Miss Morris off at school. Long then returned to Salisbury. Mitchell sent the sergeant to the Salisbury Hospital where it was determined that Long was on a methadone maintenance program.[10] The activity was the same on the following day, February 28, 1973. The surveillance lasted through March 1, 1973.

On March 15, 1973, Captain Mitchell gave Mr. Hupp a letter at a Lions Club luncheon. The letter described the results of his investigation. It concluded:

> I feel that her not being married and residing with a drug addict is not of the highest moral standard and she exemplifies a poor example for the students and athletic teams that she may coach.
>
> Trusting that some action will be taken, I am,
>
> Very sincerely yours,

On Friday, March 16, 1973, Hupp showed the Mitchell letter to Mr. Dodson because he thought it had "serious implications" and "he was her building principal." Also, during the course of that day, he showed the letter to Mr. King, the Chairman of the Board of Education, when he came to the school to sign invoices. At some subsequent time, Mr. Hupp circulated the letter at a meeting of the administrative staff.

On Monday, March 19, 1973, the members of the Board of Education were informed of the Mitchell letter. They had a joint meeting that evening with the members of the Seaford School Board and several state legislators. After the meeting, the Laurel Board members returned to Mr. Hupp's office where he read the letter and expressed the view that it could have "serious implications."[11] There was little discussion because the board members wanted "to think about it a little bit" and it was decided "to have a special meeting concerning it prior to" the board's regular March meeting two days later.[12] Mr. Hupp said he would speak to Miss Morris in the interim.[13] A suggestion was made that the advice of the board's counsel be secured and the board did subsequently confer with him about the matter.[14]

On Tuesday, March 20, 1973, Mr. Hudson, a member of the administrative staff, came to the middle school and told Miss Morris that Mr. Hupp would like to see her in his office. When she arrived, Mr. Hupp and Mr. Fox, the personnel director, were present. Mr. Hupp showed her a xeroxed copy of a portion of the Mitchell letter. He indicated that theretofore Long's presence around the school had been just a nuisance but that now it was an entirely

---

9. Mr. Dodson recommended Miss Morris for reemployment in the 1973–74 school year and also was surprised to learn that she had not been reemployed.

10. Mr. Long had at one time been addicted to heroin. Approximately two years prior to Captain Mitchell's surveillance, however, he had started on a methadone maintenance program. His efforts to control his addic- tion were successful and he ceased participation in the program shortly after that investigation.

11. T. 518, 519, 565–66, 994.

12. T. 885.

13. T. 885.

14. Whaley Dep. 51.

different matter. Hupp and Fox indicated that they would not want a person of this kind around children of theirs and that Long's presence at school was unacceptable. Mr. Hupp further stated that he would be obliged to take the matter before the Board of Education and that the Board would be likely to terminate her employment. Mr. Fox interrupted at this point and asked whether it wouldn't be better if Miss Morris thought about resigning in order to avoid a "blot" on her record. They discussed the alternatives available to her. Miss Morris indicated she would think about the matter and another meeting was scheduled for the following day.

After leaving Mr. Hupp and Mr. Fox, Miss Morris contacted the Delaware State Education Association of which she was a member. The Association's field representative, Bill Davis, accompanied her to the meeting the next day. Miss Morris, Mr. Hupp and Mr. Fox said little. Mr. Davis announced that Miss Morris was not going to be blackmailed or threatened into resigning.

On the following evening, the Mitchell letter was discussed to some extent at the executive session of the Board held prior to the regular monthly meeting. Mr. Hupp was asked if he had a recommendation with respect to the letter and he responded that he did not. The Board apparently decided not to respond. Either during a later part of this session or at another executive session held prior to the regular April meeting of the Board, the Board addressed itself to the question of renewal of contracts for the coming year. Mr. Hupp recommended non-renewal of Miss Morris' contract and the Board accepted this recommendation. No one recalls exactly what was said, but the record does reflect some things about the deliberations. Mr. Hupp based his recommendation on persistent insubordination. He conveyed

the impression to the members of the Board that Miss Morris had failed to follow directives repeatedly over an extended period of time, that she had been given an opportunity to correct this deficiency, and that the renewal of her contract for a fourth year with the attendant grant of tenure under state law would, in his judgment, result in problems for the district in the future.[15]

The Board formally voted not to renew Miss Morris' contract at a public session on April 18, 1973 and she was notified in writing of this action on April 19, 1973. No reason for the renewal was stated by the Board when it publicly voted on the matter and none was given in the termination notice. The record contains evidence, however, to indicate that other school districts subsequently inquired about the circumstances of Miss Morris' non-renewal and it is clear that on at least one occasion Mr. Hupp responded that the "biggest reason for this release was failure to comply with administrative directives.[16] The fair inference is that he conveyed the same impression about Miss Morris' performance to the prospective employer that he had communicated to the Board.

At trial, Mr. Hupp testified that he had reached his decision not to recommend renewal of Miss Morris' contract probably at some point in January and, in any event, by February 14, 1973. Accordingly, he maintained, the Mitchell letter had nothing to do with his recommendation. The members of the Board testified that, in voting for non-renewal, they relied on Mr. Hupp's recommendation, his explanation for it and their past experience with Hupp's judgment. They similarly disavowed any connection between the Mitchell letter and the non-renewal decision. Mr. Hupp and several other members of the Board acknowledged, however, that, if the facts stated in the letter were true, they would, in

---

15. This was the gist of the meeting as described by Chairman King (T. 504–5) whom the Court found to be a fair and candid witness.

16. T. 1074.

their estimation, impair Miss Morris' effectiveness as a teacher.

## II. RACIAL DISCRIMINATION

Plaintiff asserts with conviction that the District's failure to renew her contract is attributable to racial discrimination and, accordingly, that she is entitled to relief under the Civil Rights Acts, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. She correctly observes that the existence of such discrimination must ordinarily be found from circumstantial evidence and proceeds to marshal the testimony and documents which she feels demonstrates an underlying theme of racial bias.

In addition to the undisputed facts that she is black and that her employment was not renewed, Miss Morris stresses what is claimed to be disparate treatment of herself and white coaches in the District. As earlier noted, the files of white coaches who have received tenure and promotion abound with administrative memoranda indicating repeated failures to obey administrative directives, as well as other deficiencies. A brief review of the record of one of these coaches will suffice to illustrate plaintiff's point.

Mr. Doe,[17] who was initially the head football coach and later the athletic director, was originally hired for the 1969–1970 school year and attained tenure in June of 1972. In the early football practice sessions of 1969, Mr. Doe was assisted by his son, Charles, who was not a teacher in the school district. On September 29, 1969, Mr. Hupp wrote to Mr. Doe asking him to make sure his son's efforts could not be construed as coaching.

On September 21 of the following year, Mr. Harrington wrote the following note to the athletic director and Mr. Hupp:

I want it explained to Mr. Charles [Doe] that anytime he is attending a Laurel football game he is attending as a spectator. Friday night one of our staff was questioned by a scout from another school as to who the new coach was, referring to Charles [Doe].

Also, during the game on one occasion in attempting to get two substitutes into the game one of the boys was hit rather hard in the middle of the back by Charles [Doe]. I have not yet been contacted by the parents of this boy, but I'm sure that eventually I will be. I have absolutely no way of defending this type of activity by someone who is not a recognizable legal coach on our staff. If this man's activities are reported to the Delaware Secondary School Athletic Association our position in the conference would be in jeopardy.

On September 29, 1970, Mr. Hupp dispatched a memo to Mr. Doe again asking him to make sure his son's efforts could not be construed as coaching and referring to his son's presence on the bench as a "compromising situation."

In March of 1971, Mr. Harrington again saw Charles assisting at a practice—this time helping to coach the track team. This breach was considered sufficiently serious that Harrington wrote a memorandum to the athletic director containing the following warning:

THIS IS A VIOLATION THAT WE ARE GOING TO HAVE TO TURN IN IF IT CONTINUES.

The warning was relayed to Mr. Doe.

On September 6, 1972, Mr. Doe received two memos. In one, Mr. Harrington recorded an effort of Doe to remove 24 students from a weightlifting class who were not football players. Mr. Harrington's memo vetoed this idea and indicated that if Doe's plan to conduct the class for the football squad alone were carried

---

17. While Mr. Doe's real name is, of course, a matter of public record in the Court's files, no useful purpose would be served, and unnecessary embarrassment might be caused, by printing it here.

out, it would result in a violation of the DSSAA rules. The other September 6th memo was from Mr. Hupp. It referred to the requirement of attendance by coaches at faculty meetings, a requirement which had been in writing for two years but which had been frequently breached both by Doe and other coaches.

Despite these items in his file, Mr. Doe was appointed athletic director on January 24, 1973. Thereafter, he received a number of memos indicating, among other things, failure to attend a faculty meeting and another alleged breach of the DSSAA rules on unauthorized coaching. No disciplinary action was ever taken as a result of these deficiencies.

This Court agrees that plaintiff's evidence made out a *prima facie* case of racial discrimination and, under *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), placed on the defendants the burden of producing some evidence that the non-renewal of plaintiff's employment had some legally permissible foundation. In response to plaintiff's evidence, the defendants introduced testimony that Miss Morris' contract was not renewed because of job related deficiencies—primarily a failure to follow administrative directives. Given the introduction of this evidence, plaintiff had the burden of proving "by competent evidence that the presumptively valid reasons for . . . [her] rejection were in fact a coverup for a racially discriminatory decision." *McDonnell-Douglas Corp. v. Green, supra,* 411 U.S. at 805, 93 S.Ct. at 1826.

Plaintiff has convincingly demonstrated that the reasons given by Mr. Hupp for his recommendation of non-renewal were not in fact the reasons for that recommendation. Mr. Hupp indicated that he made his decision in late January of 1973. The primary reason for the recommendation is said to be that Miss Morris had failed to follow administrative directives. At that time, however, nothing had happened which would

even arguably support such a conclusion. While the Court believes that Hupp did not in fact formulate his recommendation until after Long's late February visit to basketball practice, the administration's treatment of Doe and other coaches conclusively establishes that a single failure to follow a directive about visitors at practice was not considered by Hupp to be cause for non-renewal. Indeed, the fact is that no deficiency has been attributed to Miss Morris which could not be attributed with significantly greater justification to other coaches who subsequently were recommended for and received tenure.

Finding that the reasons given by Mr. Hupp were in effect a "coverup", does not end the matter, however. Under *McDonnell-Douglas,* it is plaintiff's burden to show that there was a "coverup for a *racially* discriminatory decision." (emphasis added). The common sense rules there established by the Supreme Court for guidance in the evaluation of circumstantial evidence regarding racial discrimination do not require this Court to close its eyes to evidence indicating a different kind of motivation, and the irresistible conclusion on this record is that the disparity in Mr. Hupp's treatment of Miss Morris and the other coaches was attributable, not to her race, but to the Mitchell letter. This is apparent not only from the timing of events and Mr. Hupp's reaction to that letter, but also from the fact that Mr. Hupp's attitude towards Miss Morris prior to March of 1973 seems wholly inconsistent with racial bias towards her.

Mr. Hupp was undoubtedly aware of the rumors in the community about a boyfriend who had some kind of drug problem. Against this background came Mrs. Phillips' complaint about the boyfriend's attendance at practice. On the heels of this complaint came Captain Mitchell's letter of March 15, 1973. Mr. Hupp was obviously disturbed by its contents and considered it a serious matter. He showed it to his fellow adminis-

trators, the Chairman of the Board, and then to the members of the Board on March 19th. He expressed the view at that meeting that the letter could have "serious implications". On March 20, he confronted Miss Morris with the letter indicating that he felt the Board would find it cause for discharge and either suggesting, or tacitly supporting a suggestion, that she resign. I believe the fair inference from these facts is that Mr. Hupp foresaw that the information contained in the Mitchell letter would soon be abroad in the community and anticipated continued pressure and trouble from at least a segment of the community if Miss Morris were rehired and given tenure. I conclude that, given this unpleasant forecast of things to come, he decided to follow the path of least resistance by recommending non-renewal of Miss Morris' contract for insubordination.

The Court agrees with plaintiff that a case of employment discrimination can under some circumstances be established by evidence that a public employer yielded to community pressures resulting from racial prejudice. I do not believe that such a case has been made out against Mr. Hupp on this record, however. The community reaction anticipated by Mr. Hupp was related to the facts recorded in the Mitchell letter and I believe it apparent that concern over community racial bias did not produce the Hupp recommendation. According to Miss Morris' own testimony, her relationship with Mr. Hupp from the time of her employment in 1970 until early March of 1973 was an amicable one. As her personnel files as well as her testimony indicate, Mr. Hupp was not critical of her performance as either teacher or coach and offered the few comments which he made to her during this period by way of suggestion as to how she might improve. Most important, it seems that even during the period when Miss Morris' racial objectivity was being questioned in the community, Hupp gave her support in the parent conferences and offered counsel about avoiding the appearance of racial bias.

■ Turning from Mr. Hupp to the members of the Board, the Court concludes that plaintiff has also failed here to prove a racially discriminatory decision. The Board members, like Mr. Hupp, were exposed to the Mitchell letter. The difference between their position and his was that they had been advised by the chief school administrator that Miss Morris had been repeatedly insubordinate and did not have sufficient first-hand knowledge of the facts to know that this advice was false. So far as the members of the Board are concerned, the ground of insubordination was not a "coverup" and will not support a finding of racial discrimination.

## III. THE CONTRACT CLAIMS

Chapter 40 of Title 14 of the Delaware Code recognizes the rights of public employees to join organizations of their choice and to be represented by such organizations in their professional and employment relationships with boards of education. Sections 4006 and 4013 of that Title provide in part as follows:

§ 4006.

(a) An organization certified as the exclusive negotiating representative shall have the right to be the exclusive negotiating representative of public school employees of the school district in all matters relating to salaries, employee benefits and working conditions.

(b) Nothing in this chapter shall be construed as to prohibit the board of education and the exclusive negotiating representative from mutually agreeing upon other matters for discussion, except as prohibited in subsection (c) of § 4011 of this title. [Providing that "no public school employee shall strike while in the performance of his official duties."]

§ 4013.

. . . If there is a conflict between any agreement arising under this chapter and a provision arising under any other chapter of this title, the provisions arising under any other chapter of the title shall prevail.

At all times here relevant, Miss Morris was a member of the Laurel Education Association. That Association entered an agreement with the Laurel Board of Education on June 10, 1970 which remained in effect in the Spring of 1973. Plaintiff alleges that her rights under this collective bargaining agreement were violated by the District in several respects. These claims raise two questions: (1) Is this Court foreclosed by the Eleventh Amendment of the United States Constitution from entertaining plaintiff's contract claims and (2) If not, does the evidence establish breaches of the agreement?

### A. *The Eleventh Amendment*

■■ Under the Delaware Constitution, the General Assembly is charged with the duty of providing "for the establishment and maintenance of a general and efficient system of free public schools . . .". 1 Del.C.Ann., Const. of 1897, Art. 10, § 1. In order to fulfill its duty, the General Assembly has provided for a system of local school districts to carry out the educational function within the various geographical areas comprising the state. See 14 Del. C.Ann. § 1001 *et seq.* Thus, the Laurel School Board, like all other Delaware boards, is undeniably an instrumentality established by the state to assist the state in the performance of an important governmental function. This fact alone is not determinative of the Eleventh Amendment issue, however.[18]

Under the relevant case law, whether an entity assisting the state in the performance of a state function shares the state's freedom from suit in a federal court under the Eleventh Amendment depends on whether, in a suit against that entity, the state is the "real party in interest". *Ford Motor Company v. Department of Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); *Urbano v. Board of Managers of New Jersey State Prison*, 415 F.2d 247, 250 (3rd Cir. 1969); *S. J. Groves & Sons Company v. New Jersey Turnpike Authority*, 268 F.Supp. 568, 574 (D.N.J.1967). The term of art "real party in interest" has been interpreted by the Third Circuit as follows:

In determining whether an "alter ego" status attaches to the instrumentality of a state, it has been said:

"* * * [L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance.

Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations. . . ."

*Urbano v. Board of Managers, supra,* 415 F.2d at 250–51.

Turning to the case at hand, it is clear that under Delaware law ultimate

---

18. Compare *Gordenstein v. University of Delaware*, 381 F.Supp. 718, 723 (D.Del. 1974) and cases cited therein; see also *United States Steel Corp. v. Multistate Tax Commission*, 367 F.Supp. 107, 113 (S.D.N. Y.1973).

legal control of the educational process is in the hands of the state. See, for example, 14 Del.C.Ann. §§ 121, 122, 1043, 1049, 1058. Nevertheless, in deciding how the educational process might best in practice be carried out, the state legislature has provided local school districts with considerable autonomy and opportunity for initiative. A district board of education—the entity vested by law with the operational duties of "administer[ing] and . . . supervis[ing] the free public schools . . . and [of] determin[ing] policy and adopt[ing] rules and regulations for the general administration and supervision of the free public schools," 14 Del.C. Ann. § 1043—is elected *locally*, 14 Del.C.Ann. § 1051 , and is required to prepare an annual report to its constituents, 14 Del.C.Ann. § 1050. A district board is vested with the power to adopt courses of study and to select, purchase and distribute textbooks and all other necessary educational materials and apparatus, 14 Del.C.Ann. § 1049(4), (5). The school board appoints the superintendent of schools, who functions as the chief school officer and, as it became clear during this case, substantially determines the day-to-day operation of the schools, 14 Del.C.Ann. § 1091.

Significantly, the district board and its constituents (the latter operating by means of referenda) have the power to levy taxes "for school purposes" and to determine the amount of money to be expended on education within the district.[19] Among other things, the board and the voters may supplement basic teachers' salaries appropriated by the state, 14 Del.C.Ann. § 1304, and may, in addition, employ more teachers than the basic state salary appropriations would otherwise allow, 14 Del.C.

Ann § 1705(b). The board and the voters may substantially determine the quality of the physical plant in the district as well, by exercising their power to exceed the standard formula used to determine the amount of state funds to be appropriated for construction purposes, 14 Del.C.Ann. § 2004. If the board and the voters do choose to exceed the standard formula, the board is empowered to issue bonds, 14 Del.C.Ann. § 2102, and the faith and credit standing behind those bonds is that of the district. 14 Del.C.Ann. § 2104.[20]

Of particular significance is the local district's power in that most important aspect of the educational process—personnel. Apparently reflecting a legislative judgment that personnel matters are best handled at the local level, the local districts are vested with the authority to appoint personnel, 14 Del.C.Ann. § 1049(8) and, subject to state-imposed procedural requirements, to dismiss personnel, 14 Del.C.Ann. § 1401 *et seq.*[21] And, as previously noted, it is the local boards which are vested with the authority to bargain with, and enter into collective agreements with, associations of school employees. 14 Del.C.Ann. § 1401 *et seq.*

Turning to the questions of whether the District has the power to pay a judgment on its own initiative and whether payment would be made with state funds—the questions which have generally been considered to be of critical importance, *Urbano v. Board of Managers of New Jersey State Prison, supra; Whitten v. State University Construction Fund,* 493 F.2d 177, 180 (1st Cir. 1974)—the case for exclusion of the district from the Eleventh Amendment's shield becomes quite persuasive. As noted above, the local boards are empow-

19. Taxes raised locally, while paid over to the state treasurer, are kept in a segregated account, 14 Del.C.Ann. § 1917(b).

20. The district's faith and credit may also be pledged behind borrowings in advance of local taxes, 14 Del.C.Ann. § 1922.

21. It is noteworthy that the appeal process from personnel decisions of the local board runs to the Delaware Courts, 14 Del.C.Ann. § 1414, and not to the state board of education or any other legislatively-created authority.

ered to raise funds through local taxes for "school purposes". Given that the board has power to contract and may be sued on its contracts in state courts,[22] it logically follows that satisfaction of a contract suit judgment constitutes a "school purpose". Otherwise, the rights of the board's contractual obligees would be hollow, indeed. Thus, the Laurel School Board has the "power to satisfy" a judgment from local District funds without the necessity of action by the State Board of Education or the General Assembly. Based on this fact,[23] and the fact that the Laurel Board, like other Delaware Boards, possesses considerable autonomy of operation and power of initiative, the Court concludes that the Eleventh Amendment does not bar suit against the District on the collective bargaining agreement. See *King v. Caesar Rodney School District*, 396 F. Supp. 423 (D.Del.1975) (where, in addition to the Board's having the statutory authority to levy taxes to pay judgments, it appeared that the Board carried insurance, the premiums for which had been paid by local funds).[24]

## B. *The Merits Of Plaintiff's Contract Claims*

The Court deems only three of plaintiff's contract claims worthy of discussion.[25]

■■■ Section C of Article IV of the contract provides:

No teacher shall be disciplined, reprimanded, reduced in rank or compensation, or deprived of any professional advantage without just cause. Any such action asserted by the Board, or any agent or representative thereof, shall be subject to the grievance procedure herein set forth.

Plaintiff claims that her discharge was "without just cause" and occurred despite her demand that the matter be taken up under the contract grievance procedure which, among other things, ultimately terminates in arbitration.

If Article IV C were construed to be applicable to the non-renewal of the employment contract of a non-tenured teacher, I believe it would be of doubtful validity under Delaware law. The Delaware Court of Chancery has found a leg-

---

22. Under Delaware law, a legislative authorization to enter into contracts constitutes a *pro tanto* waiver of any state-law sovereign immunity defense. *George & Lynch v. State*, 197 A.2d 734 (Del.Supr.1964). While this fact would be determinative of the immunity question were this a suit in state court, it does not determine the Eleventh Amendment question. See *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Daye v. Commonwealth*, 483 F.2d 294, 298 (3rd Cir. 1973).

23. The District does not claim that it does not currently have local funds available to pay a judgment in this action although, as in the case of other judgment debtors, those funds would have to be diverted from other uses.

24. *Cf. Smith v. Concordia Parish School Board*, 387 F.Supp. 887 (W.D.La.1975); *Fabrizio & Martin, Inc. v. Board of Education*, 290 F.Supp. 945 (S.D.N.Y.1968). The Court is aware of authority holding local school boards exempt from suit in federal court under the Eleventh Amendment. See, *e.g. O'Neill v. Early*, 208 F.2d 286 (4th Cir. 1953); *Wihtol v. Crow*, 309 F.2d 777 (8th

Cir. 1962). These cases do not employ the *Urbano* analysis, however, and appear to place undue emphasis on the fact that the school boards were assisting in the performance of a state function. Moreover, while these cases indicate that the school districts concerned used state funds, these cases do not set forth the statutory scheme under which the schools involved were funded and, in particular, do not indicate whether the school boards in question had the power to raise funds to pay judgments through local levies. *But see Harris v. Tooele County School District*, 471 F.2d 218, 222 (10th Cir. 1973) (dissenting opinion). The cases which do so indicate (in the affirmative—*King, Smith*, and *Frabizio, supra*) strike this Court as the more persuasive.

25. Article IV, Section A of the Agreement provides in part that "the Board undertakes and agrees that it shall not directly or indirectly . . . deprive . . . any teacher in the enjoyment of any rights conferred . . . by the Constitution of Delaware and the United States." Plaintiff does not press this provision as a basis for *district* liability in this case.

islative intent implicit in Delaware's tenure statutes, 14 Del.C. § 1401 *et seq.*, "that the reason for not renewing a non-tenured teacher is something that a school board does not have to discuss or justify . . . ; rather, it is an area where the General Assembly intended the discretion of the school board to remain free from contractual commitment." *Newman v. Board of Education*, 325 A.2d 387, 390 (Del.Ch.1974). This Court need not pass on the validity of Article IV C, however, because it is satisfied that the parties did not contemplate its application to the current situation. A far clearer statement of intent would be required in order to lead this Court to the conclusion that the Board intended to delegate to an arbitration panel its statutory discretion on teacher contract renewal.

Section D of Article IV of the Agreement provides that whenever a teacher is required to appear before the Superintendent or the Board "concerning any matter which could adversely affect the continuation of that teacher in his . . . employment . . . then he shall be given prior written notice of the reasons for such meeting or interview and shall be entitled to have a representative of the Association present to advise . . . and represent him." The Court agrees with plaintiff that the meeting of March 20, 1973 to which Miss Morris was peremptorily summoned by Mr. Hupp falls within the language of this contractual provision. In maintaining that this meeting nevertheless did not fall within the spirit and intent of Section D, defendants make three arguments: (1) the meeting was for informational purposes only and application of this provision to such a meeting would make the efficient day-to-day operation of a school impossible, (2) Miss Morris' employment could not have been adversely affected by the subject matter of this meeting because Mr. Hupp had already decided to recommend non-renewal and (3) the provision, as

construed by plaintiff, would violate Delaware law.

It may be granted that Section D, if applied to all situations arguably within its literal sweep, would be unworkable and that a Court should not assume that the parties intended such a result. It seems to the Court, however, that if the events of March 20, 1973 were not held to bring Section D into play, that contractual provision would be deprived of all meaning. There is no question that Mr. Hupp felt the Mitchell letter might affect the continuation of Miss Morris' employment. He said so at the meeting. And, even accepting his assertion that he had made up *his* mind regarding his recommendation, the ultimate decision had not been made by the Board. Indeed the fair inference is that the Board expected Hupp to talk with Miss Morris about the matter and report back at the March 21st meeting. This would appear to be precisely the kind of situation in which the bargainers contemplated a teacher should have the opportunity to maturely consider the matter to be discussed and thoughtfully prepare his response. If such an opportunity had been afforded, Miss Morris might well have supplied information regarding Mr. Long's condition or her relationship with him which would have placed the Mitchell letter in a materially different light.

The District's argument concerning the validity of Article IV D is also without merit. While the collective bargaining statute does not impose a legal duty on school boards to bargain on matters other than "salaries, employee benefits and working conditions", Section 4006(b) seems clearly to *permit* the negotiators to bargain on other subjects during contract talks as long as the ultimate agreement is not inconsistent with other Delaware statutes.

The Court sees nothing in those statutes which can fairly be said to be in conflict with the contract right plaintiff here asserts. It is one thing to say that the Delaware legislature intended school

boards to exercise unfettered discretion in deciding whether to renew contracts of untenured teachers, and quite another to attribute to that body an intention to preclude a school board from agreeing to afford a fair opportunity for the teacher to present her side of matters which may jeopardize her continued employment.

The Court also concludes that the District violated Miss Morris' rights under Article XVIII of the collective bargaining agreement which is entitled "Teacher Evaluation." Section C of that Article deals with the procedure to be followed in the event of "complaints regarding a teacher made to any member of the administration or by any parent . . . which are or may be used in any manner in evaluating a teacher." Unmistakably, one function of this provision is to provide a means for amicably resolving community complaints concerning teachers. The provision is not designed solely for that purpose, however. As its title would indicate, teacher evaluation is the focus of all of the provisions of Article XVIII. The overall thrust of that Article is the promotion of fair evaluation of teachers through procedural safeguards.

The purpose of Section C, in particular, is to assure a teacher that if a parental complaint is received which *may* affect his or her evaluation, an effort will be made to resolve the problem reflected by the complaint so that it will not unfairly affect that evaluation. The prescribed procedure contemplates that so long as the teacher, after informal conferences at the principal level, continues to think the problem may unfairly affect evaluation, the matter will be brought before the superintendent for a recommendation. The procedure further contemplates that after the superintendent's recommendation, the Board will af-ford the teacher a hearing before it acts upon that recommendation.

While Mr. Hupp in effect by-passed the initial stages of the prescribed procedure and did not follow all of the provisions relating to the procedure at the superintendent level, the Court concludes that Section C was applicable to the situation in which the parties found themselves on March 21, 1973, and that the Board breached a contractual duty by failing to afford Miss Morris an opportunity to tell her side of the story. The Mitchell letter was clearly a complaint from a parent which held the potential of affecting Miss Morris' evaluation. The superintendent was apprised of it in writing and was well aware that it might affect the Board's evaluation of Miss Morris. The Board was informed in writing of the letter on March 19, 1973 and anticipated that Mr. Hupp would talk to Miss Morris and return to the March 21st Board meeting with a recommendation. As of the beginning of that meeting the Board had not yet conducted an evaluation but knew that one was imminent. Accordingly, it is difficult to imagine a situation more squarely within the intent of Section C.

It is true that each of the members of the Board testified that the Mitchell letter played no role in their termination decision. The Court believes this testimony. This does not, however, mean that relief should be denied on plaintiff's contract claims. Trying to assess the motivation of a diverse group of people in a trial many months after a decision is made is a difficult task at best and is precisely the kind of thing the contract provisions here in issue were designed to avoid. Plaintiff's Association bargained for procedural protections to avoid the risk of employment decisions based on one-sided evaluations. That risk was present in Miss Morris' case [26] and the Court should attempt to

---

**26.** Some of the members of the Board may have foreseen the same community pressure on the horizon as did Mr. Hupp. Indeed, some may well have been relieved when the Hupp recommendation obviated the necessity of considering the issues arguably raised by the Mitchell letter. Human nature being what it is, in this atmosphere the risk that

fashion a remedy that will give her the benefit of the Association's bargain.

## IV. THE DUE PROCESS CLAIM

Plaintiff also maintains that the individual defendants (other than Mr. Harrington[27]), while acting under color of state law, have deprived her of liberty and property without due process of law. In analyzing this claim, it is appropriate to first determine whether the interests which Miss Morris had at stake were "liberty" or "property" interests giving rise to rights under the Due Process Clause.

### A. *Property Interest*

The guidelines for determining when a school teacher's interest in continued employment rises to the level of a "property" interest within the meaning of the Fourteenth Amendment were set forth by the Supreme Court in the *Roth* and *Sindermann* cases.[28] In *Roth,* the court stated that, in order to receive constitutional protection, the employee's interest must amount to more than a mere "unilateral expectation of [continued employment]." 408 U.S. at 577, 92 S.Ct. 2701. Rather, the employee must have a "legitimate claim of entitlement" to continued employment. *Id.*

In *Roth* the court cited three categories of cases in which such a "legitimate claim of entitlement" had been held to exist. The first category involved situations in which an express contract granted tenure or secured the right to employment for a term not yet expired. *Id.* at 576–77, 92 S.Ct. 2701. The second category involved situations where there was no express contract, but a "clearly implied promise of continued employment." *Id.* at 577, 92 S.Ct. at 2709. The final category involved situations

where statutory or administrative standards defined eligibility for a benefit and a citizen had a legitimate claim that he or she was qualified for the benefit under those standards. *Id.* at 576, 92 S.Ct. 2701. In *Sindermann,* the court observed that the absence of "formal contractual or tenure security" was "highly relevant" to the plaintiff's due process claim but indicated that it would not in all instances be "dispositive" of such a claim. 408 U.S. at 599, 92 S.Ct. 2694. Referring to the law of implied contracts, the court noted that there were instances where "[e]xplicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in light of the surrounding circumstances.' " *Id.* at 602, 92 S.Ct. at 2700, citing 3A *Corbin on Contracts* § 562. As an example, the court cited the field of collective bargaining where agreements are regularly supplemented by "the common law of a particular industry or of a particular plant." *Id.* The court then hypothesized a situation where there "might be an unwritten 'common law' in a particular university that certain employees . . . [would] have the equivalent of tenure," noting that this might be "particularly likely in a college or university" like the one before it, "that has no explicit tenure system even for senior members of its faculty." *Id.*

The court in both *Roth* and *Sindermann* stressed that property interests are not created by the Constitution. Rather, there must be an independent source in state or federal law. 408 U.S. at 583, 608, 92 S.Ct. 2701. The property interest claimed must thus be recognized by law and, while a teacher's expectation of continued employment need not be secured by "a formal con-

the Mitchell letter might have some impact was clearly present.

27. Plaintiff tacitly concedes in her brief that there is no record basis for a judgment against Mr. Harrington and this is clearly correct. Judgment will be entered in his favor.

28. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ; *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

tractual provision", it must, at least, be "secured by a no less binding understanding fostered by the" school administration.

One further principle may be deduced from *Roth* and *Sindermann*. A teacher must be able to point to some objective criteria, however established and defined, by which the school administration has indicated a willingness to limit its discretion. Undoubtedly, all school administrators seek to give the impression to non-tenured teachers, as well as to new applicants for employment, that decisions on employment are not made in the district in an irrational manner. Accordingly, no teacher would be without a protected "property interest" if all that was required was a showing of an expectation that employment decisions would be made on the basis of the administration's perception of the qualifications of the teacher, the qualifications of others available for employment, and the needs of the school system. This Court thinks it clear from the opinions in *Roth* and *Sindermann,* and, in particular, from *Roth's* holding that the professor there involved had no property interest, that the Supreme Court did not intend such a result.

Miss Morris does not here contend that her written 1972–73 contract with the Laurel Board held forth any express promise of continued employment (and, coincidentally, tenure). Rather, she has alleged that "under defendants' evaluation procedures, non-tenured teachers in the District have a clear expectation of continued employ-

ment absent inadequate performance." The record said to support this allegation consists of testimony by two Board members and Mr. Hupp to the effect that teachers in the Laurel District are not non-renewed without a reason[29] and the testimony of an additional Board member that, unless something is wrong with a teacher, he or she is "generally" rehired. In addition, Miss Morris points to a letter circulated by the District prior to her non-renewal inquiring whether she intended to return the following year, her affirmative response, and Mr. Dodson's indication that he had recommended her reemployment. All this, it is said, created more than a unilateral expectancy.

In order to evaluate this claim, we must first turn to the Delaware statutes. Under Delaware law, teachers who have completed three years of service in the State cannot be terminated at any time except for certain specified reasons.[30] While teachers without three years of experience cannot be discharged during the school year except for statutorily-prescribed reasons,[31] no similar limitations are placed on the non-renewal of such teachers at the end of any school year. All that is required is an advance notice which need not specify the rationale of the termination decision. 14 Del.C. § 1410.

Arguably, the Delaware statutory law precludes a public school board from limiting its discretion where renewals of non-tenured teachers are concerned. *Cf. Newman v. Board of Education, supra.* That question has not been decided by

---

29. E.g.,
 Q In each case, when a person is not renewed, contract is not renewed, there is a reason. You just wouldn't fire him or her or not renew him for no reason?
 A That is right. (T. 586)
 * * * * *
 Q The board just doesn't dump somebody, there is a reason when they don't rehire them, isn't that correct, sir?
 A There would have to be a reason, yes. (T. 543)

30. "Immorality, misconduct in office, incompetency, disloyalty, neglect of duty, wilful and persistent insubordination, a reduction in the number of teachers required as a result of decreased enrollment or a decrease in educational services." 14 Del.C. § 1411. A reduction in enrollment or educational services will not justify a mid-year termination, however. 14 Del.C. § 1420.

31. "Immorality, misconduct in office, incompetency, disloyalty, neglect of duty, or willful and persistent insubordination." 14 Del.C. § 1420.

the Supreme Court of Delaware, however, and this Court finds it unnecessary to intrude into that area in order to resolve the case before it. Assuming that a Delaware school board can legally fetter its discretion, plaintiff's evidence nevertheless falls far short of establishing a mutual understanding in the Laurel District that a teacher in Miss Morris' position would have a "legitimate claim of entitlement" to continued employment as that concept is employed in *Roth* and *Sindermann.*

Because of the above-described statutory provisions, teachers in the Laurel District, as well as administrators and Board members, considered the renewal of a contract for a fourth year to be a highly significant event. It was thus recognized in the school community that teachers receive rights upon renewal for a fourth year which they did not previously have. While this is not in itself dispositive of the issue before the Court, the existence of detailed statutory tenure regulations which were clearly understood to distinguish a year-end termination of a teacher in Miss Morris' position from other terminations, indicates to the Court that Miss Morris could not have had an objective expectation of employment beyond the 1972–73 school year absent some unambiguous assurance of school authorities to that effect.[32] Yet there is no evidence in this case that the School Board engaged in any conduct which could be said to have communicated an assurance of this kind. The trial testimony to which plaintiff points does not indicate that the School Board fostered any understanding in the school community prior to Miss Morris' termination and, indeed, consists of nothing more than statements by school officials that employment decisions were not made on an arbitrary basis. The District's spring letter of inquiry appears to be nothing more than an attempt by the District to ascertain the interest of teachers in remaining with the District and was not a commitment to hire any teacher responding affirmatively. Neither, of course, does a principal's recommendation constitute an assurance of reemployment. *Roseman v. Hassler,* 382 F.Supp. 1328 (W.D.Pa.1974), *aff'd.,* 520 F.2d 1364 (3rd Cir. 1975). The evidence in this case thus falls short of demonstrating that Miss Morris had a property interest protected under the Due Process Clause.

## B. *Liberty Interest*

 Plaintiff has demonstrated, however, that her discharge for persistent insubordination implicated a liberty interest. While a teacher's interest in a particular teaching job does not constitute a liberty interest, a teacher does have an interest in her ability to pursue her teaching career which is protected by the Due Process Clause. One acting under color of state law may not substantially impair that interest by action having no basis in fact; nor can such an impairment occur consistent with the Fourteenth Amendment absent procedures appropriate to the various interests involved. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L. Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L. Ed.2d 570 (1972).

 In the *Roth* case, the Supreme Court recognized that a state cannot foreclose a range of employment opportunities in a manner that contravenes due process. Such a foreclosure may, of course, take the form of an absolute bar to a segment of government employment,[33] or the denial of a license to practice one's profession.[34] The foreclosure of employment opportunities

---

32. Compare *Sindermann* where the defendant institution had no formal tenure system and the plaintiff could point to statements in a "Faculty Guide" and an administrative "Policy Paper".

33. *Wieman v. Updegraff,* 344 U.S. 183, 73 S. Ct. 215, 97 L.Ed. 216 (1952).

34. *Schware v. Board of Bar Examiners,* 353 U.S. 232,˙ 77 S.Ct. 752, 1 L.Ed.2d 796 (1957).

need not be as certain or as drastic as these examples, however. In *Schell v. Board of Trustees,* C.A. No. 4673 (Unreported Opinion of July 31, 1973) at p. 45, for example, this Court found a due process violation where the evidence showed that a school administrator's non-renewal for "insubordination and failing to fulfill administrative directives" would "substantially impair her ability to obtain subsequent employment in teaching and educational administration." Similarly, early this year, the Supreme Court found the Due Process Clause to be applicable in a situation where the suspension of a student for misconduct *"could* seriously . . . interfere with later opportunity for higher education and employment." *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (emphasis supplied). See also *Arnett v. Kennedy,* 416 U.S. 134, 157, 94 S.Ct. 1633, 40 L. Ed.2d 15 (1974) (plurality opinion: liberty is offended "by a dismissal based on an unsupported charge which *could* wrongfully injure the reputation of an employee") ; *Suarez v. Weaver,* 484 F.2d 678 (7th Cir. 1973); *Carpenter v. School District,* 358 F.Supp. 220 (E.D. Wis.1973).

██ The evidence in this case amply demonstrates that the interest infringed by the decision to terminate Miss Morris' employment was not merely her interest in her job with the Laurel District. The non-renewal of her contract for persistent failure to obey administrative directives held the potential for severely impairing her ability to pursue her profession. This was apparent from the testimony of the Board members, Mr. Harrington and a professional in the teacher placement field having experience with employment practices in Delaware and the surrounding states. This testimony satisfied the Court that the vast majority of school hiring officers, upon learning of a non-renewal for a reason of this kind, would not initiate an investigation of the matter and would give no further consideration to the ap-plication. In light of this fact, Miss Morris' discharge cannot be dismissed as merely a factor which "might make . . . [her] somewhat less attractive to some other employers." See *Board of Regents v. Roth, supra,* 408 U.S. at p. 574, n. 13, 92 S.Ct. at p. 2708.

It is, of course, true that the Board members did not directly accuse Miss Morris of persistent insubordination by so stating in her notice of termination or in a filed report. Under the practice which prevailed in Laurel and other Delaware school districts, however, a district which had not renewed a teacher would be contacted before the teacher was hired by another district and the reason for the termination would be discussed. Members of the Laurel Board testified at trial that they would expect that districts making inquiries of this kind would be told the reasons for termination. In this case, we know that this expectation was justified; Mr. Hupp, in fact, told a prospective employer of Miss Morris' insubordination. Accordingly, when the Laurel School Board acted it must have appreciated the potential for injury to Miss Morris' career. That potential was made no less real or substantial by the fact that the reasons for termination would be disseminated orally in the natural course of events rather than in writing. See *Suarez v. Weaver,* 484 F.2d 678 (7th Cir. 1973).

## C. *The Merits Of The Due Process Claim*

The Court thus concludes that Miss Morris had a liberty interest of which she could not be deprived without being accorded procedural and substantive due process. Concededly, she was terminated for persistent insubordination without being informed of the charge and without being given an opportunity to tell her side of the story. A violation of procedural due process has thus been established. In addition, the Court has found that the termination on this ground was without any basis in fact. Accordingly, a violation of substantive due process has also been established.

## V. THE REMEDY

### A. *Reinstatement*

Plaintiff maintains that as a result of defendants' breaches of duty under the Fourteenth Amendment and the collective bargaining agreement she is entitled to reinstatement as a teacher in the Laurel District. In support of this contention she cites several cases in which this Court has found reinstatement to be an appropriate remedy for discharges found to violate the constitutional rights of a public employee. When these and the other cases in this area are analyzed, however, it becomes apparent that plaintiff's right to reinstatement is far from clear.

We must start with the proposition that a remedy must be fashioned with an eye to the protected interest which has been infringed. A court should not grant redress which accords more compensation to the plaintiff than is warranted by the interest giving rise to the claim for relief. These principles are well demonstrated by reference to those cases where the defendants were found guilty of a violation of the Due Process Clause.

Turning first to the "property interest" cases, where the plaintiff is a tenured teacher and, accordingly, has an objective expectation of reemployment year after year, reinstatement is ordinarily found to be necessary to give full protection to the property right infringed. *See, e. g., King v. Caesar Rodney School District,* 380 F.Supp. 1112 (D.Del.1974). Where a teacher is non-tenured, however, and is discharged during the term of a contract limited in time, reinstatement after expiration of the contract term has been found to be inappropriate and relief has been limited to damages accruing during the contract term. In *Skehan v. Board of Trustees,*

501 F.2d 31 (3rd Cir. 1974), for example, the court addressed itself to a factual situation in which a number of bases for relief had been cited by a professor discharged in the middle of his contract term without a due process hearing. The court indicated that reinstatement might be appropriate if the discharge had been in violation of the plaintiff's First Amendment rights or his rights under an alleged contract between the college and its faculty, but not if his discharge violated his right to procedural due process only. 501 F.2d at 41.[35] See also *Perry v. Sindermann,* 408 U.S. 593, 603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (recognizing that proof of a property interest infringed in violation of due process does not necessarily entitle the plaintiff to reinstatement); *Bhargave v. Cloer,* 355 F.Supp. 1143 (N.D.Ga.1972); *Bates v. Hinds,* 334 F. Supp. 528 (N.D.Tex.1971).

The "liberty interest" cases also reveal an effort on the part of the courts to fashion relief in light of the character of the protected interest which has been infringed. In *Board of Regents v. Roth, supra,* the Supreme Court stated that one whose standing in his community or profession will be jeopardized by a discharge is entitled to notice and a hearing to refute the charges against him. It then added: "The purpose of such notice and hearing is to provide the person an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, remains free to deny him future employment for other reasons." 408 U.S. at 573 n. 12, 92 S.Ct. at 2707. Based on this observation, it has been held that where the sole interest protected by the Fourteenth Amendment is a liberty interest in one's professional reputation, the appropriate remedy for a due process violation is not reinstate-

---

35. The court found that back pay relief should be limited to the scope of the property interest, stating:

But assuming no more than the [procedural] due process violation which the dis-

trict court found, backpay from . . . [the date of discharge] to the end of the contract year would seem appropriate." 501 F.2d 31, 41 (3rd Cir. 1974).

ment but rather a hearing to afford an opportunity to clear the plaintiff's name. *Wellner v. Minnesota State Junior College*, 487 F.2d 153 (8th Cir. 1973); *Cf. Burton v. Cascade School District*, 512 F.2d 850 (9th Cir. 1975).

Insofar as Miss Morris' claim for relief rests upon her constitutionally-protected liberty interest in pursuing a teaching career, the Court believes that the remedy should be limited to an opportunity to "clear her name" and damages for any injury incurred between the time of discharge and the time when the burden on her right to pursue her teaching career has been lifted.[36] Moreover, it appears to the Court, in light of the findings which this Court has been required to make in order to dispose of the issues presented by the parties, that this lawsuit itself has provided Miss Morris an opportunity to clear her name and that she has done so in convincing fashion. That being so, I cannot see that an additional hearing before the Board on Mr. Hupp's charges of persistent insubordination would in any way add to the remedy that this decision has provided. Accordingly, insofar as the due process claims are concerned, the appropriate remedy is limited to damages.

The interest which the Teachers Association sought to protect for Miss Morris in the collective bargaining provisions is a different one, however, and its infringement calls for relief of a different stripe. This interest relates specifically to her continued employment in the Laurel District and not solely to her general interest in pursuing her career. What was bargained for were procedural rights to safeguard against unfair teacher evaluation in certain specified situations which did occur in Miss Morris' case. Under the contractual provisions breached, Miss Morris had a right to be considered for reemployment in an atmosphere uncontaminated by charges which she did not have a fair opportunity to rebut. Accordingly, it is this Court's duty to fashion a remedy which will result in her receiving the kind of consideration for reemployment to which she was entitled. While this is not an altogether easy task, the Court believes it can be accomplished.

---

36. The Court recognizes that implicit in this conclusion is a rejection of plaintiff's argument that the right to substantive due process is not predicated on the existence of an property or liberty interest. The Supreme Court cases upon which plaintiff principally relies—namely, Cafeteria Workers v. McElroy, 367 U.S. 886, 898, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Slochower v. Board of Education*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952)—are explained in *Roth* and *Sindermann* as ones involving property or liberty interests. 408 U. S. at 573, 576–77, 92 S.Ct. 2701. While some commentators and at least one court have suggested that Supreme Court cases in areas outside the public employment field presage an extension of the substantive due process rights of public employees, the prevailing view after *Roth* and the view of this Court is that the Supreme Court has not indicated that a non-tenured teacher whose employment terminates without injury to her community or professional reputation, is entitled to a trial in a federal court solely on the claim that the termination decision was without basis in fact. See *Buhr v. Buffalo Public School District*, 509 F.2d 1196 (8th Cir.1974); *Jeffries v. Turkey Run Consolidated School District*, 492 F.2d 1 (7th Cir. 1974); *Case Comment*, 87 Harv.L.Rev. 1842 (1974); *Comment: Due Process and Public Employment in Perspective: Arbitrary Dismissals of Non-Civil Service Employees*, 19 U.C.L.A.L.Rev. 1052 (1972); *Comment: Substantive Due Process: The Extent of Public Employees' Protection from Arbitrary Dismissal*, 122 U.Pa.L.Rev. 1647, 1648–9 (1974); *Contra: Thompson v. Gallagher*, 489 F.2d 443 (5th Cir. 1973). While the holdings of *Roth* and *Sindermann* deal only with procedural due process rights, the Due Process Clause itself is limited to deprivations of life, liberty and property interests and, if a public employees' interest in a particular job does not constitute such an interest for the purposes of the procedural protections provided by that Clause, this Court fails to perceive a rational basis, in similar circumstances, for recognizing substantive rights which are conferred solely by that clause. See *Pavlov v. Martin*, 381 F.Supp. 707, 710 (D.Del.1974).

The consideration to be given reemployment of a teacher in Miss Morris' position should be given, if feasible, by the body responsible for the successful operation of the District's educational program. While cases can readily be conceived where reconsideration by the School Board would not be fair, this fortunately is not one of them. Not all present members of the School Board were serving in the Spring of 1973 and nothing that has happened in the course of this case indicates to the Court that the defendants who remain on the Board cannot be counted upon to exercise a good faith judgment based on the facts developed here, any other facts which Miss Morris may provide at a hearing, and such additional facts as they choose to solicit from the principals of the schools in which Miss Morris served.

Fashioning an adequate remedy in this case does involve a substantial problem relating to timing, however. When Miss Morris had a right to fair consideration for reemployment in the Spring of 1973, the School District was in a position to weigh its decision unfettered by any contractual commitments to other non-tenured teachers. Presumably, this is not true at the present time insofar as the 1975–76 school year is concerned. Obviously, it would be unfair to Miss Morris to require that she be given consideration for reemployment in a context in which the Board could justifiably reply that it had no place for her. Accordingly, the Court has concluded that the fairest resolution of the remedy problem is to require that the Board consider Miss Morris for reemployment when it makes its plans for the 1976–77 school year, that it afford her an opportunity to be heard at that time, and that damages on Miss Morris' breach of contract claim include her loss of earnings up until such time as a favorable decision could be implemented by putting her back on the payroll. If the Board so elects, however, it will be given an opportunity, prior to the entry of final judgment, to find a position for Miss Morris in the coming school year. If she is rehired for the 1975–76 school year, damages will be limited accordingly.

## B. *Damages*

■ Defendants due process infractions have resulted in Miss Morris not being able to pursue her teaching career from the time of her non-renewal through the earliest date, subsequent to this Opinion, at which she could conceivably acquire a teaching job. Defendants' contract breaches have resulted in Miss Morris not receiving a fair evaluation from March of 1973 until such time as she can be fairly considered for reemployment. In each case, the damages are the same and consist of the difference between the salary Miss Morris could have made as a teacher and the salary she did, in fact, make at the alternative employments she was forced to accept. While the record is not as fully developed on the question of damages as one might expect, enough can be pieced together to support a damage award.

Miss Morris' annual salary during the 1972–73 school year was $8,326.00. Should she be reinstated this September, she would thus have lost the opportunity to earn twice that amount, or $16,652.00. Her actual earnings between the time of her non-renewal and this September would be as follows:

| $1,820.00 | 26 wks. at 40 hrs./wk. at $1.75 per hr. | Seamstress (Oct. '73–Mar. '74) |
| --- | --- | --- |
| $2,579.20 | 26 wks. at 40 hrs./wk. at $2.48 per hr. | Hospital trainee (Apr. '74–Sept. '74) |
| $6,067.00 | 48 wks. at 40 hrs./wk. at $3.16 per hr. | Hospital trainee (Oct. '74–present) |

The total of these actual earnings is $10,466.20. Thus, if Miss Morris is reinstated in September, she will have lost, and be entitled to an award of, $6,185.80.

Should Miss Morris not be reinstated this September, she will be entitled to a further year's damages computed as follows: $8,326.00 less $6,572.80 (52 wks. at 40 hrs./wk. at $3.16 per hr.) or $1,753.20.[37]

While the record thus supports an award of lost earnings, it will not support Miss Morris' claim for "humiliation and embarrassment". This claim is predicated upon the circulation of rumors in a community regarding the subject matter of the Mitchell letter and none of the defendants have been shown to be responsible for the circulation of those rumors.[38]

Turning from the quantum of damages to the liability of the various defendants based on the rationale set forth in the preceding discussion regarding reinstatement, judgment will be entered against the School District on plaintiff's contract claims in the amount of plaintiff's loss of earnings between September 1, 1973 and September 1, 1976, unless the Board determines to engage Miss Morris for the 1975–76 school year, in which event damages will cease as of September 1, 1975.

As far as the individual defendants are concerned, the Court finds that Mr. Hupp and the members of the Board stand in different positions. Mr. Hupp, acting under color of state law, made an accusation against Miss Morris which he knew to be without any basis in fact. He made this false charge knowing on the basis of past experience that the members of the Board would be content to rely solely on his word and that a discharge based on persistent insubordination would seriously injure Miss Morris' career. Based on these facts, Section 1983 requires that Mr. Hupp should be held liable, jointly and severally with the District, for Miss Morris' lost earnings. While his actions were not motivated by personal animus towards Miss Morris in the traditional sense, his deliberate inflection of injury precludes any holding that he acted in "good faith" as that concept is applied in the law of official immunity.[39] Moreover, the Court concludes that Mr. Hupp clearly knew that the position taken by him in defense of this case was meritless. That defense has, accordingly, been conducted in bad faith and has wrongfully required plaintiff to incur litigation expense in order to vindicate her rights. An award of attorneys' fees against Mr. Hupp is, therefore, appropriate.[40]

37. In addition, Miss Morris also claims $25 in miscellaneous expenses incurred in seeking other employment. An award of this amount is appropriate.

38. Plaintiff did not testify to any other humiliation or embarrassment or to any other damage arising from the interruption of her career.

39. Despite this finding of bad faith for purposes of the official immunity doctrine, the Court does not believe this to be an appropriate case for an award of punitive damages against Mr. Hupp as suggested by plaintiff. While the Court does not condone the tactics of Mr. Hupp, it does appear that his misguided efforts had some relationship to his perception of the School District's problems. Moreover, the primary purpose for an award of punitive damages is to serve the public interest in deterring future illegal conduct by the defendants or others similarly situated. See, e. g., Davidson v. Dixon, 386 F.Supp. 482, 486 (D.Del.1974). The Court has determined that Miss Morris' non-renewal was not the result of any systematic practice, racial discrimination or other denial of constitutional rights. Rather, the decisions surrounding Miss Morris' non-renewal appear to have been made under pressure, and in the face of unusual factual circumstances. Accordingly, punitive damages seem unnecessary to prevent the recurrence of similar constitutional violations in the Laurel District or elsewhere.

40. Alyeska Pipeline Service Company v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); Goode v. Rizzo, 506 F.2d 542, 549 (3rd Cir. 1974) (award of attorneys' fees appropriate "where there has been bad faith, vexation or oppression").

**216**

The members of the School Board have also been found to have violated Miss Morris' rights under the Fourteenth Amendment while acting under the color of state law. Accordingly, they should also be held liable under Section 1983 unless they are protected by the doctrine of official immunity. The controlling law on this question was summarized by the Supreme Court in *Wood v. Strickland*, 420 U.S. 308, 95 S. Ct. 992, 43 L.Ed.2d 214 (1975), which dealt with a school board's denial of the due process rights of students:

. . . The official must himself be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice.

. . . That is not to say that school board members are "charged with predicting the future course of constitutional law." . . . A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.

95 S.Ct. at 1000.

The School Board members in this case were exercising discretionary functions; they acted in reliance on the integrity of Mr. Hupp which they had had no previous reason to doubt. The Court believes that in deciding not to renew Miss Morris' contract, they were acting sincerely in the belief that they were doing right. Accordingly, the only arguable basis for denying them official immunity would be if it could be said that they denied Miss Morris' procedural due process "with such disregard of . . . [her] clearly established constitutional rights that [their] . . . actions cannot be reasonably characterized as being in good faith." I cannot so hold, however. At the time the Board made its decision on renewal, the law regarding the existence of a liberty interest in factual circumstances like those confronting the Board was far from clear. While *Roth* had made it clear that total "foreclosure" of access to a segment of the employment market infringed a liberty interest, the *Schell* case had not been decided and the right to a hearing prior to a non-renewal on grounds of insubordination was not the kind of "clearly established" constitutional right spoken of in *Wood v. Strickland*. Accordingly, the members of the School Board will be included only in the injunctive section of the judgment.

The Court will confer with counsel regarding an appropriate form of final judgment.