John R. RUSHTON, Plaintiff,

v.

Thomas SHEA et al., Defendants.

Civ. A. No. 4377.

United States District Court,
D. Delaware.

May 24, 1976.

Garry G. Greenstein, Knecht, Greenstein & Berkowitz, Wilmington, Del., Robert T. Healey, Haddonfield, N. J., for plaintiff.

Aubrey B. Lank, of Theisen, Lank & Mulford, Wilmington, Del., for defendants Markward, Cahill, Trans Car Services Co. and Delaware Railcar Leasing.

Howard L. Williams, and Edward M. McNally, of Morris, James, Hitchens & Williams, Wilmington, Del., for defendants Shea, Delaware Investment Co. and DICB, Inc.

## OPINION

STAPLETON, District Judge:

This is an action between a resident of the State of New Jersey and certain individual and corporate domiciliaries of the State of Delaware.[1] The matter in controversy exceeds $10,000 and jurisdiction is thus properly founded upon 28 U.S.C. § 1332(a)(1). Plaintiff asserts that he has been wrongfully deprived of his stock in a certain corporation, wrongfully deprived of monies due him as the owner/lessor of four railroad cars and, lastly, has had his credit injured by an attachment action brought without probable cause and for an ulterior purpose. Defendants have denied liability and that issue has been severed from the issue of damages, and tried to the Court. Upon the record thus presented, the Court makes the following findings of fact and conclusions of law.

## THE FACTUAL BACKGROUND

Plaintiff is a practicing psychiatrist. Early in the 1960's, he and Charles Markward, his brother-in-law, jointly founded a company known as Diamond State Tank Car Corporation (hereinafter "Tank Car"). This company was in the business of repairing and servicing railroad cars. It was managed by Markward;[2] Rushton's role was evidently that of financier.[3] The other principal source of capital for Tank Car was a small business investment corporation known as Delaware Investment Company ("DIC"), whose current president and chief operating officer is defendant Thomas Shea. DIC, over the years, was to lend Tank Car substantial amounts of monies.[4]

The first loan from DIC to Tank Car occurred in March of 1962. The loan was in the amount of $100,000 and the obligations evidencing Tank Car's indebtedness took the form of a judgment note in the amount of $89,000 and a debenture with face amount of $11,000.[5] In conjunction with this transaction, Dr. Rushton's fortunes became inseparably intertwined in the business relationship between DIC and Tank Car. First, Dr. Rushton signed both of the debt instruments and does not dispute DIC's contention that the intent of such signing was to make him a guarantor of Tank Car's indebtedness.[6] Secondly, in a collateral agreement evidenced by a June 5, 1962 letter from Rushton to DIC, Rushton agreed to fully subordinate his own claim

---

1. Pre-trial Order, Doc. No. 62, at p. 1.

2. Mr. Markward is now deceased and the Court did not have the benefit of his testimony at trial.

3. Rushton claims, in fact, to have contributed almost $235,000 to Tank Car over the years. T. 10; Plaintiff's Trial Exhibit (hereinafter PX) 39. In March of 1967, however, the money owed Rushton by Tank Car was only claimed by Rushton to be $36,800, see DX 19, and the "Statement of Affairs" submitted in 1971 in conjunction with Tank Car's petition for relief

under the Bankruptcy Act listed Rushton as an unsecured creditor with an amount owing of $63,775. PX 41. The amount of Dr. Rushton's initial equity investment is not clear from the record.

4. See DX 5, and exhibits to PX 20.

5. DX 6; DX 7.

6. The loan agreement called for such guarantees by Rushton; DX 5, Exh. "D", p. E–6.

under a $41,000 Tank Car note to DIC's claim for $100,000.[7] Last, under the terms of the loan agreement[8] there was pledged as security for the loan "[a]ll the presently issued and outstanding capital stock of [Tank Car], with signed powers of attorney".[9]

Although Dr. Rushton asserts that Tank Car was successful, at least initially, it appears that Tank Car fell into arrears on its obligation to DIC after a timely first payment of $5,000. In addition, it appears that in order to keep Tank Car operative, Dr. Rushton had to regularly advance money over the years. See DX 9–17. For many years, however, DIC did not avail itself of its right to call its loan.[10]

In the Spring of 1968, DIC and Tank Car renegotiated the Tank Car loan and, on March 31, 1968, entered a loan agreement under which the past due interest was capitalized and a note and debenture were issued in the principal amount of $125,000.[11] The agreement signed by the two corporations, like the preceding agreement, contemplated that Rushton would be an endorser of the Tank Car debt and would pledge all of his Tank Car stock as collateral. Differences had arisen by this time between Rushton and Shea[12] and Rushton apparently never signed the debt instruments.[13]

Dr. Rushton concedes that his own monies due from Tank Car continued to be subordinated to DIC's claims, pursuant to an overriding subordination agreement entered into a year earlier which provided, *inter alia:*

> I do hereby subordinate the payment of any and all amounts now owing by the debtor to me no matter how arising, to the payment in full of all debts or obligations now or hereafter owing by the debtor to you. . . .
>
> I do further agree not to accept any payment of principal or interest in whole or in part of any claims against the debtor . . . until all indebtedness to you from debtor shall be paid. . . .
>
> My obligations hereunder shall continue in full force and effect until payment in full of debtor's indebtedness to you. . . .[14]

That is how matters stood at the time of the formation of a second Delaware corporation, Delaware Railcar Leasing, Inc. (hereinafter, for reasons which will appear, "Old Railcar"). The business of this corporation was the rental of railroad cars to such industrial customers as Rohm & Haas and Hercules, etc. Charles Markward was the founder of the corporation, but after Rushton protested that Markward, in establishing the corporation, had appropriated a corporate opportunity of Tank Car, an agreement was reached in the early part of 1969 whereby Rushton obtained, for consideration of $1,750, a 50% interest in Old Railcar.[15] Under this agreement, Markward received 111½ shares of Tank Car in return for a promise to pay $57,000.

---

7. DX 8.

8. DX 5.

9. *Id.*, Exh. "B", p. E–6.

10. At least in part, this would appear to have been due to Rushton's continual out-of-pocket expenditures to keep Tank Car operative and his willingness to subordinate his claims for these advances to the claims of DIC. *Id.*

11. DX 3–A. The agreement did not provide for cancellation of the prior loan agreement or the note executed in connection with it.

12. T. 12.

13. The defendants did not place the original debt instruments in the record in support of their defense. The note and debenture appear in the record only in unexecuted form. DX 3–A. The lack of endorsements is affirmatively documented in the record, however, in three ways. When DIC ultimately brought suit against Rushton on his Tank Car guarantee the suit was founded on the 1962 debt instruments. PX 17. Moreover, DIC's Amended Claim in Bankruptcy (Exh. 1–d) and the settlement agreement of November 2, 1971 (PX 19), both of which are discussed hereafter, are consistent only with the view that Rushton was a guarantor of the 1962 obligation only.

14. DX 19.

15. PX 6.

Contemporaneously, the March 31, 1968 Tank Car/DIC loan agreement was amended to provide for the addition of the entire stock of Railcar to the collateral securing the obligation. In addition, although neither the March 5, 1962 nor March 31, 1968 agreements had specified the exact scope of DIC's rights with respect to the collateral in the event of default, the 1969 agreement specified, with respect to both the Old Railcar and Tank Car stock, that DIC would have "the right to sell such stock after ten days notice to the stockholders".[16] This agreement was executed by DIC and Tank Car. Simultaneously, Rushton delivered a certificate for 100 shares of Old Railcar stock with power of attorney. (PX 15).

As for the operations of Old Railcar, it had been doing business at first at a modest rate, apparently utilizing used railroad cars. In the latter part of 1969, however, a new opportunity presented itself. It was learned that ten new railcars could be purchased from ACF Industries for $16,300 each and rented to the Rohm & Haas Corporation. As a result, an agreement was struck among Old Railcar, its stockholders (including Rushton), and DIC whereby DIC would lend Old Railcar $150,000 for the purpose of purchasing the ten cars.[17] Under the terms of this agreement, DIC was to advance $45,000 immediately to provide Old Railcar with the funds to make a down payment to ACF, and to provide the balance upon the delivery of the cars by ACF. The loan was to be repaid "in One Hundred Fifty-Four (154) successive, substantially equal installments on the first day of each month beginning April 1, 1970."[18] Under the agreement, numerous covenants ran from Old Railcar to DIC. As security, Old Railcar advanced the following, *inter alia:*

i) All inventory and equipment of Railcar now owned or hereafter acquired, and all additions or accessions thereto;

ii) All contract rights and accounts receivable of Railcar now existing or hereafter arising;

\* \* \* \* \* \*

iv) Proceeds and products of all the foregoing.

As further security, the Old Railcar stockholders (including Rushton) pledged "all of their stock of Railcar."[19]

The loan agreement gave DIC the right to demand payment directly from account debtors, and "to the extent DIC . . . [should] demand" the right to have Old Railcar turn over to DIC all proceeds of its accounts receivable.

The loan agreement contained the following description of DIC's rights with respect to the posted collateral:

On the occurrence of any event of default, DIC may, at its option and without demand on Railcar, Rushton, Markward, J. Blank or L. Blank, declare due and payable in accordance with law, any and all monies due or to become due with respect to the loan or loans and note or notes hereunder, and any other payment liabilities secured thereby, together with . . . enter upon or in any premises and without breach of peace take possession of the collateral or any item or items thereof; and exercise any or all of the rights and remedies given the secured party under the Delaware Uniform Commercial Code. . . .[20]

Listed in the agreement as an event of default were the following, *inter alia:*

a) Failure of Railcar to pay, discharge or perform any liabilities, secured hereby;

b) Failure of Railcar to perform any covenant, warranty or obligation hereunder;

\* \* \* \* \* \*

16. DX 3–B.

17. PX 1.

18. PX 1, p. 3.

19. PX 1, p. 4.

20. PX 1, pp. 15–16.

e) Loss, theft, substantial damage or destruction of any of the collateral . . .[21]

At about the same time this loan agreement was struck, Tank Car was apparently experiencing another of its recurrent cash flow problems. As a result, when it developed that the initial $45,000 advance under the loan agreement was not needed as a down payment on the new railcars, it was decided to loan these funds to Tank Car.[22] This $45,000 did not completely solve the problem, however, and it was shortly thereafter determined that Tank Car was in need of further advances. It was decided that Rushton and DIC would provide $75,000 worth of assistance. Rushton, however, was unwilling to lend money directly to Tank Car; rather, he purchased $37,500 worth of "bonds" from Delaware Valley Factors ("DVF") who had a senior secured claim to payment of debts of Tank Car.[23] DVF, in turn, lent the $37,500 to Tank Car.[24]

DIC had given Rushton to understand that they would advance funds to Tank Car in the same way. S.B.I.C. regulations prohibited such a "lending-for-relending" transaction, however, and DIC loaned their $37,500 directly to Tank Car.[25] This loan was unsecured.[26] This $37,500 advance was evidently in addition to a $30,000 loan in June of 1969 which, for all that appears, was likewise unsecured.[27]

By the time the new railroad cars were to be delivered, the $45,000 which had been diverted to Tank Car had been replaced by a loan from DVF.[28] Another "hitch" developed, however, when DIC discovered that Old Railcar and Tank Car were "affiliates" as defined in the regulations governing small business investment companies— which fact, for reasons not made of record, supposedly precluded DIC from lending more than enough money to cover, together with the $45,000 advanced by DVF, the price of 6 of the 10 rail cars.[29] When Old Railcar was not able to independently raise the funds necessary to consummate its contract with ACF Industries, Tom Shea produced a rescuer in the form of his brother, Norman Shea, an accountant from Pennsylvania. A series of transactions ensued with respect to the acquisition of the four railcars not financed by DIC.

It is clear that the 4 railroad cars were in fact acquired from ACF and rented by Old Railcar to Rohm & Haas at a rental of $185 per month per car.[30] The record leaves unclear, however, who specifically tendered the purchase price to ACF.[31] We do know, however, that a receipted invoice orginally sent by ACF to Old Railcar covering all 10 cars was returned by Old Railcar with directions that it be "divided into two documents".[32] Ultimately, Norman Shea received a receipted invoice for the 4 railcars which was dated March 13, 1970, addressed to him as "Norman Shea, Attorney", and reflected receipt of payment on March 16, 1970. This invoice listed, in the space marked "customer", "Delaware Railcar Leasing".[33] At about the same time, Norman Shea received from Old Railcar a demand note in the amount of $65,200, payable in full in twelve months, (with the space for recording the interest left

---

21. *Id.,* p. 15.

22. T. 187. Just how and by whom this decision was made is not developed in the record. Defendant Shea, however, was an officer and director of both Tank Car and Old Railcar at this time.

23. DX 18.

24. T. 68–70.

25. See exhibits to PX 20; T. 70.

26. PX 31.

27. See Exhibit 2, PX 20.

28. T. 188–89.

29. T. 95.

30. PX 3 (second part).

31. The only witness whose testimony was directed towards this subject said that he "didn't remember". T. 116.

32. T. 256.

33. PX 36.

blank) [34] and an accompanying letter from Old Railcar stating:

Dear Mr. Shea:

This letter will serve to qualify our discussion relative to the four (4) new railroad tank cars No. DRLX 2006–2009 which you are acquiring for us to lease. Pursuant to the expressed terms of the lease of even date [sic].

It is further understood that we may redeem the ownership of these cars at any time within one year of the date hereof by payment of the principal amount of $65,200 plus interest at 1% per month and thereafter pursuant to a negotiated price to be defined.

We are attaching hereto a note for the advance maturing March 31, 1971 thereby evidencing our intent to pay off this advance within the prescribed 12 months. . . . [35]

Both the note and the letter were signed on behalf of Old Railcar by Charles Markward (President) and Thomas Shea (Secretary).[36] Except for the names of the parties and the number of railcars involved, the lease referred to in the letter just quoted is identical in all respects to the lease agreement between Old Railcar and Rohm & Haas. It describes Norman Shea as "lessor", Old Railcar as "lessee", and provides for a "rental" of $185 per car per month.[37] In addition, it provides in other pertinent part, that "this agreement is effective as of March 12, 1970 and shall remain in full force and effect with regard to each car furnished hereunder for fifteen (15) years from the date of this contract, and thereafter on a month-to-month basis unless terminated by other party within thirty (30) days notice." [38]

Most of the rest of the year 1970 passed without further relevant development. Toward the end of the year and the beginning of 1971, however, two extremely significant events occurred. First, Norman Shea served notice that the funds he had procured "for a limited time" were now needed again. Old Railcar and DIC were still unable, however, to raise the funds to cover the cost of these four cars, and Rushton was approached to step into the breach. For whatever reason, Rushton decided to cooperate and took steps to secure a loan from the bank in New Jersey where he did his personal banking. That loan was in the amount of $65,000.[39]

Shortly after the New Year, Rushton received from "N. Shea, Attorney" a bill stating:

4 railroad cars leased by Delaware Railcar Leasing, Inc.

Nos. DRLX 2006–2009    $64,375.57 [40]

and an accompanying letter stating:

Dear Mr. Rushton:

In accordance with the instructions of Thomas Shea, attached is a bill for four (4) railroad cars, . . . . The $64,-375.57 is due on or before January 4, 1971. . . .

Upon receipt of your check, the financing papers will be forwarded to you.[41]

The second significant event occurred on January 8, 1971. At 5:15 P.M. on that date, a Friday, DIC dispatched a "night letter" to Tank Car and its stockholders stating as follows:

Pursuant to our loan agreement dated 3/31/68 as amended 3/31/69 and 6/24/70, you are herewith notified that we are exercising our default prerogatives as applied to demand for immediate payment in full and custody of all collateral to cover any non-payment by Diamond State Tank Car.

You are further noticed herewith of a meeting of stockholders and directors on Monday, January 11, 1971, 8:00 P.M. at

---

34. DX 43.

35. PX 29.

36. PX 29; DX 43.

37. PX 29.

38. *Id.*, ¶ 4.

39. PX 37A, B; T. 25.

40. PX 2.

41. *Id.*

the corporation office to submit payment in full satisfaction of the above demand or we shall proceed accordingly with the election of directors and officers to serve during the period required to effect our full recovery.

On the same date, another "night letter", identical to the one just quoted, except for the substitution of "Delaware Railcar Leasing, Inc." for "Diamond State Tank Car" in the first paragraph, was sent to Old Railcar and its stockholders.[42] These letters were followed on January 11, 1971 by further letters to the two companies stating the amounts that were "due and payable".[43] The total amount alleged to be due from Tank Car was $121,092.53 and, from Old Railcar, $98,864.21. While the record is unclear, some kind of meeting was subsequently held, but no action was taken because the parties agreed to give it "one more try".[44]

Also in January of 1971, Rushton dispatched a check to Norman Shea in the amount of $65,654.42.[45] At about the same time, Rushton and Old Railcar executed a "lease agreement" identical, except for the names of parties and relevant dates, to the Norman Shea/Old Railcar "lease".[46] While Shea testified that he remembered signing an Old Railcar note to Rushton, similar to the one given to Norman Shea, I am not persuaded that such a note was executed and dispatched to Rushton.

In early 1971, there were extensive discussions among the directors and officers of Tank Car as to how to resolve the company's recurring financial crises. The discussions evidently resulted in an agreement that Tank Car's problems would best be solved by a financial reorganization. On March 5, 1971, pursuant to a corporate resolution of the same date, a proceeding for an arrangement under Chapter XI of the Bankruptcy Act was filed.[47]

After the filing, however, no agreement could be reached as to who would put up the $100,000 needed to straighten out Tank Car's affairs. Counsel for Tank Car ultimately appeared before the Bankruptcy Referee and stated that, because some of those who had agreed to inject new money into Tank Car had reneged, the situation was hopeless and an adjudication was appropriate.[48]

On May 19, 1971, DIC filed a petition in the bankruptcy proceedings to reclaim, pursuant to its security interest, the Tank Car equipment and inventory.[49] This petition was opposed by Rushton[50] as well as by general creditors of Tank Car, who filed a petition to change the form of the proceedings from Chapter XI to Chapter X.[51]

On June 2, 1971, Tank Car ceased doing business. The failure of the reorganization plan and the filing of the reclamation petition spawned a flurry of activity in the Summer of 1971. On June 28, 1971 Rushton filed suit against Markward in this Court seeking recovery of the purchase price of the 111½ shares of Tank Car transferred under the Rushton/Markward agreement of March 31, 1969.[52] On July 8, DIC, purporting to be the "sole stockholder" of Old Railcar, waived notice of a meeting of stockholders and proceeded to elect directors and officers.[53] Thomas Shea became both secretary and treasurer of Old Railcar, and remained as a director. Mr. Markward remained president. Rushton and his attorney were replaced on the board. On the same date, Old Railcar

42. PX 33.

43. PX 7, 22.

44. T. 298.

45. PX 2.

46. PX 3.

47. PX 41.

48. T. 44–47.

49. PX 41.

50. Exh. "O-E", p. 3.

51. Bankruptcy Action 71–56, Doc. No. 1.

52. PX 6, ¶ 5.

53. PX 28.

ceased paying Rushton any monies under the January 1, 1971 "lease agreement". Two days after that, DIC brought suit against Rushton in the Philadelphia Court of Common Pleas, commencing the action by writ of foreign attachment. The praecipe for the writ listed DVF as garnishee, and alleged that "the amount of [DIC's] claim is $61,000." [54] The complaint proceeded on the theory that Rushton was the endorser of Tank Car's March 5, 1962 note to DIC which was claimed to be in default to the extent of the amount claimed.[55]

Meanwhile, the petition to convert the Chapter XI proceedings to Chapter X had been granted.[56] DIC filed an amended proof of claim in August of 1971.[57] In this filing, DIC claimed to be owed $123,386.68 by Tank Car and to have, as "its only security therefor":

> (a) Lien upon all debtors inventory and equipment . . .
>
> (b), (c) [stock of Tank Car and Old Railcar].
>
> (d) Endorsements of Charles H. Markward and John R. Rushton, III as to Note dated June 5, 1962, and endorsement to Charles H. Markward as to note dated March 31, 1968.

Shortly after the filing, however, the Chapter X proceeding itself was dismissed and Tank Car was relegated to straight bankruptcy on August 18, 1971.[58] In his answer to the reclamation petition, filed on October 8, 1971, Rushton asserted that the March 31, 1968 loan agreement was invalid because approved only by directors having a conflict of interest and that DIC, even if it had a valid security interest, was not in jeopardy because "the value of the inventory, equipment and work in progress of the debtor exceed[ed] the amount of the presently outstanding debt owed to . . ." DIC.[59]

Also on October 8th, the Trustee in Bankruptcy filed an appraisal of the Metropolitan Appraisal Co. which estimated that Tank Car's machinery and equipment "at a forced liquidation sale or an auction sale would bring a total of $55,225." The appraiser also estimated the "Fair Market Value"—that is "the value of the machinery and equipment as a WHOLE INTEGRATED UNIT to the OCCUPYING OWNERS as a GOING OPERATING CONCERN" to be $346,775.

On November 2, 1971, Rushton entered into a settlement agreement with DIC. In return for a release of his personal liability on the 1962 Tank Car notes and a promise of DIC to drop its Pennsylvania suit, Rushton agreed to withdraw his objection to the reclamation petition.[60]

On November 8, 1971 there was a hearing on DIC's reclamation petition. Rushton appeared by counsel and withdrew his objection to the petition.[61] At the hearing, the Referee asked that the Trustee consider the matter and advise him whether or not a sale of the assets of the bankrupt would be desirable. On November 9, 1971 the Trustee, "speaking for the unsecured creditors", advised that a "Petition for Sale would not be in order". The Trustee assumed that the secured debt to DIC was $59,000 and noted, *inter alia:* (1) that he had no funds to winterize or adequately insure the premises pending such a sale, (2) that the $55,000 appraised value of the machinery and equipment seemed realistic and (3) that, given the expenses of a sale, bank rent and other priority obligations, secured debts and other items, a sale would have to bring approximately $230,000 before the unsecured creditors would receive anything.

On November 10, 1971, the Referee entered an order approving the Reclamation

---

54. PX 17.

55. *Id.*

56. Bankruptcy Action 71–26, Doc. No. 6.

57. Exh. "1–d".

58. Bankruptcy Action 71–56, Doc. No. 18. This approach was evidently taken when no

one came forward with a feasible plan of reorganization for Tank Car. *Id.*

59. Exh. 1–e.

60. PX 19.

61. DX 1–C.

Petition on the condition that DIC would (1) cause general releases to be executed in favor of the Trustee, the Bankrupt Estate and the Receiver by DIC and by two other secured creditors who were owed approximately $31,500 [62] and (2) enter an agreement purchasing the accounts receivable from the Trustee for $24,949.75 and assuming Tank Car's future lease obligations. This later agreement was subject to approval of the Referee after notice to all creditors. No creditors objected at the December 8, 1971 hearing, the agreement was approved on December 10, 1971, and DIC then received substantially all of Tank Car's assets.

The reclamation was granted on the "assumption" that DIC's security interest secured no more than $59,000 of the debt claimed to be owing from Tank Car to DIC.[63] The Referee also found "that the Bankrupt Estate [was] . . . without funds to safeguard the premises upon which the assets of the Bankrupt Estate are located."

The litigation did not cease with the grant of the Reclamation Petition, however. Before Rushton could extricate his $27,500 from DVF in payment of his bonds, DIC filed a second suit in the Philadelphia Court of Common Pleas.[64] This suit, launched under the aegis of new counsel was, like the first, begun by an attachment of Rushton's Delaware Valley Factor's bonds. The complaint in this second case, verified by Thomas Shea, claimed that Rushton owed DIC $59,000 and stated, in relevant part, as follows:

> From June 16, 1969 through April 1, 1970, Diamond State Tank Car Company made three promissory notes dated June 16, 1969, March 31, 1970 and April 1, 1970 payable in installments as set forth therein . . . and delivered the same to the Plaintiff, the payee therein. . . .
>
> Defendant was aware of the existence of these notes and other indebtedness due to plaintiff and did in fact agree to subordinate any obligations owed to Defendant by Diamond State Tank Car Company to obligations including but not limited to these three notes due to Plaintiff . . . . .
>
> Plaintiff has made demand against defendant for the balance due on the said note. . . .[65]

The records of the Prothonotary's office state that on "May 10, 1972 Pltfs. Writ of Foreign attachment is quashed and the above action is dismissed. Hirsh, J." [66] Sometime in late May or early June, Rushton did finally acquire the $27,500 and used it in at least partial payment of his bank loan. By this time, however, Rushton had received a series of embarrassing letters from his bank.[67]

On May 10, 1972, Rushton filed this suit alleging, among other things, (1) that he was the holder of 100 shares of common stock of "Delaware Railcar Leasing, Inc." and entitled to have this stock "restored" to him and (2) that he was the owner of four railcars leased to Old Railcar and entitled to the rentals therefrom.

On January 3, 1972, DIC sold the reclaimed Tank Car assets to a corporation known as TCS Company whose name is now Trans Car Services Company (hereinafter

---

**62.** The record does not disclose what DIC paid to secure the necessary releases from the other secured creditors. It does appear that DIC made some substantial payment to DVF for this purpose.

**63.** *Id.* This assumption was evidently made in light of a report which the Referee had before him which had been prepared by the counsel for the Trustee, which in turn reflected the fact that some question as to the exact amount covered by DIC's security interest had been raised. The reason for the question was that a June 24, 1970 amendment to the March 31,

1968 loan agreement, stated that the principal on the March 31, 1968 loan had been reduced to $66,600, which amount had been reduced to $59,000 by the time of the bankruptcy. See PX 41; DX 1–A, Exh. A, p. 1.

**64.** PX 20.

**65.** PX 20.

**66.** PX 21.

**67.** See PX 24–27.

"TCS").[68] As defendants' brief puts it, "DIC again reset the total Tank Car debt so that TCS in effect became Tank Car with the Tank Car assets and the debt to DIC".[69] The consideration paid was $22,132.10 in cash and a $159,000 judgment note. Markward, until his death in early 1973, operated TCS and was its principal stockholder.

At some point in early 1973, apparently prior to April 27th, Old Railcar caused its name to be changed to DICB, Inc. and transferred its assets to a corporation newly organized under the name Delaware Railcar Leasing, Inc. ("New Railcar"). New Railcar assumed the obligations of Old Railcar.[70] Markward had died by this time and his widow, Helen Markward, was the sole stockholder of New Railcar. At this point she was also the sole stockholder of TCS.

Eventually, TCS was sold to a Mr. Thomas Cahill. On June 20, 1973, at Mr. Cahill's urging, New Railcar advanced $75,000 to TCS[71] and assumed all of TCS's debt to DIC.[72] In consideration, New Railcar received 200 shares of preferred stock of TCS.[73]

The nature of the transaction was such that, immediately prior to the trial, New Railcar was indebted to DIC in the amount of $274,475, to secure which debt all of the assets of New Railcar and TCS were pledged, along with all of the stock, both common and preferred, of the two corporations. Defendant Shea candidly admitted that this transaction could not be justified from New Railcar's point of view if the two corporations were viewed as separate entities. His justification was that the same parties were interested in both corporations and that it was in their common interest to reduce the debt of TCS.

In this context, Rushton asks (1) that he be paid the value of his Old Railcar stock on the date DIC "effected full recovery of the debt due from Tank Car" by foreclosure on its assets, (2) that the four railcars which he claims to own be restored to him or, in the alternative, that he be paid their value, together with back rentals, and (3) that he be awarded damages for malicious use of process.[74]

## ANALYSIS

### I. RUSHTON'S CLAIM AGAINST DIC WITH RESPECT TO HIS OLD RAILCAR STOCK.

On January 1, 1971, Tank Car was indebted to DIC in the amount of approximately $121,000.[75] Rushton was not, however, personally liable for this amount. Nor was his Tank Car and Old Railcar stock pledged to secure this entire debt. Rushton's Tank Car and Old Railcar stock was pledged in 1969 to secure the Tank Car debt under the Agreement of March 31, 1968 and the 1970 Amendment to that Agreement recites that the principal had then been paid down to $66,600. Rushton's Old Railcar stock was also pledged to secure the Old Railcar debt to DIC under the December 19, 1969 loan agreement.

At the time of the January 8th night letters, Tank Car was concededly in default on the debt to DIC under the March 31, 1968 Agreement and DIC was clearly within its rights when it declared a default and accelerated the loan. It was not, however, within its rights when it declared a default on Old Railcar's debt to DIC.

DIC, in claiming a right to declare a default and accelerate this debt, relies to

**68.** PX 9.

**69.** Post-trial brief of defendant Shea, DIC and DICB, Inc. Doc. No. 75, at 15.

**70.** T. 267–68.

**71.** $60,000 of this money was borrowed by New Railcar from the Bank of Delaware which now owns a senior security in certain assets of New Railcar.

**72.** PX 14.

**73.** PX 13. On June 20, 1973, New Railcar also entered a five year employment contract with Helen Markward calling for the payment of $5,200/year for consulting services.

**74.** Plaintiff's Main Brief p. 59.

**75.** Pre-trial Order p. 5.

some degree on three theories. First, it points out that the payments under the December 1969 Agreement were due on the first of each month and, while they were paid each month between December 1969 and January 1971,[76] they were not paid until the middle of the month when the lessors paid their rent. DIC concedes, however, that "the late payments are not sufficient to entitle DIC to exercise its prerogatives on a default."[77] Accordingly, I turn to the other alleged events of default which are said, in combination, to have entitled DIC to accelerate the Old Railcar debt.

The Agreement of December, 1969 recited that the initial $45,000 to be loaned was to be paid as a down payment on the ten new railcars. Instead, it was loaned to Tank Car when it was discovered that a down payment would not be necessary. First, DIC claims that this was a "breach of covenant" and that the Agreement made a "failure of Railcar to perform any covenant" an event of default. Second, DIC asserts that this loan to Tank Car created an account receivable which automatically became a part of the collateral securing the Old Railcar debt to DIC and that Tank Car's bankruptcy in March of 1971 caused a default because it constituted "loss . . . or destruction of . . . collateral." I am unpersuaded.

At the time of the $45,000 loan to Tank Car, Tom Shea was a director of both companies as well as the financial consultant to each. As one would expect, given these facts and DIC's very substantial creditor's interest in both corporations, the record indicates that he was centrally involved in all of the financial dealings of these corporations. While concededly there is no direct evidence of the fact, the circumstantial evidence is quite persuasive, and I find it inconceivable that Mr. Shea did not approve this loan to Tank Car.

█ Moreover, even if Mr. Shea had not approved it, he concedes that he knew about the loan by January of 1970, that DIC had a greater financial stake in Tank Car than Old Railcar, and that Tank Car at this time was sorely in need of working capital. For virtually a year DIC took no action in protest of this loan. The reason is clear. DIC was willing to permit this use of funds because of its interest in keeping Tank Car afloat.[78] Having taken this calculated risk and sat on its hands for a year, DIC was in no position in January of 1971 to rely upon this Tank Car loan as a breach of covenant. Nor is the December 19, 1969 Agreement susceptible of an interpretation that a default occurred every time an account receivable became uncollectible and that the Tank Car bankruptcy was, accordingly, an event of default.[79]

In January of 1971 DIC, after appropriate notice, could have sold Rushton's Old Railcar stock pursuant to Section 9–504 of the UCC and applied the proceeds to the Tank Car debt, or it could have proposed to take the collateral under Section 9–505 of the UCC in full satisfaction of the secured Tank Car debt. 6 Del.C. §§ 9–504, 9–505. But DIC availed itself of neither of these remedies.

76. As well as thereafter, at least up until December of 1972. T. 155–56.

77. Def. Br. p. 44. This concession is both understandable and surprising. It is understandable since the parties clearly contemplated, at the time of the December 19, 1969 agreement, that the rental payments, when received, would be used to pay DIC (T. 190–93) and this had been the practice since the inception of the agreement. This concession is nonetheless surprising because Shea testified that the January 8, 1971 letter to Old Railcar was prompted by an "inflexible demand" by Rushton and wrangling between Rushton and Markward and it is apparent to the Court that the only default Shea had in mind at the time was the failure to make the January 1st payment until January 22nd. (T. 271–74).

78. Shea conceded at trial that anything which would enure to the benefit of Tank Car would help DIC's position, and went on to state that at this time "we viewed both corporations as a single entity and consequently the interests of one were the interests of the other". T. 187–88.

79. The "destruction of collateral" clause relied upon by DIC, read in context, was obviously not intended to apply to intangibles like accounts receivable.

This brings us to July 8 of 1971. Old Railcar had continued to make its monthly payments on its debts to DIC and this debt was not in default. The Tank Car debt remained in default, however, and DIC had the same remedies available to it with respect to the Old Railcar collateral as it had in January. It did not elect to sell this collateral, however.[80] Neither did it elect to take all or a part of its collateral in full satisfaction of the Tank Car debt. This is apparent not only from the fact that it gave no notice to Rushton pursuant to Section 9–505 but also (1) from the fact that it subsequently sued Rushton to recover the portion of the Tank Car debt for which he was personally liable and (2) from the representations made by DIC to the Bankruptcy Court with respect to the amount due on the Tank Car debt and the continuing status of Rushton's Old Railcar stock as collateral for that debt.

What DIC in fact did was to exercise a remedy which I doubt was legally available to it. It caused Rushton's Old Railcar stock to be registered in its own name and assumed the management of the Corporation. As reflected in the minutes of the July 8, 1971 meeting, this action was purportedly taken pursuant to the January 8, 1971 night letter advising Rushton that if the Old Railcar loan was not paid in full, DIC would elect officers and directors "to serve during the period required to effect . . . full recovery".[81] Perhaps this constituted a conversion of Rushton's Old Railcar stock, but I need not so hold since Rushton acquiesced in this temporary seizure of control and does not now claim any relief based on this event.

It is agreed by the parties that the November 1971 settlement agreement released Rushton from personal liability on the Tank Car debt and that DIC subsequently foreclosed on Tank Car's equipment and inventory. Rushton maintains that this foreclosure made DIC whole and that the reten-

tion of his Old Railcar stock after the foreclosure constituted a conversion. As will be discussed more fully hereafter, I am unable to determine from the present record whether the foreclosure rendered DIC whole. I do not consider the deficiency at this stage to be fatal to Rushton's claim, however, because the record clearly establishes a meritorious claim against DIC based on its subsequent actions with respect to Old Railcar even if it was not made whole by its foreclosure on the Tank Car assets.

DIC concedes to a "technical" breach of duty in 1973 when it caused Old Railcar to convey all of its assets. This is true, DIC acknowledges, because it conveyed the assets rather than the stock and because it did not observe the "formality" of notice. Accordingly, if Rushton can establish damage, he has a claim under Section 9–507 of the UCC. 6 Del.C. § 9–507.

■ To this can be added that the voting of the pledged Old Railcar stock in favor of a transfer of all of its assets clearly constituted a conversion of Rushton's stock to which he did not acquiesce. The appropriate remedy for this conversion would be a judgment in the amount of the value of Rushton's interest in his Old Railcar stock at the time.

DIC responds to these facts by asserting that Rushton has suffered no injury since it is "clear that the Old Railcar stock would have brought little if anything to be applied against Tank Car's debt." In support of this contention, DIC pointed out that there was no public market for the stock, that based on past performance its earnings value was minimal, that the Old Railcar assets were mortgaged to the maximum degree leaving it "with a net book value in a minimum amount, depending on how unearned lease income is calculated", and, finally, that any proceeds of a sale of Old Railcar stock would clearly have been less than the deficiency due on the Tank Car

---

**80.** Even if it had given the requisite notice of an intention to sell, it could not have purchased the stock at a private sale. 6 Del.C. § 9–504(3).

**81.** It is to be noted that the January 8th night letters did not, in fact, speak of taking over the management of *Old Railcar* pending full recovery on the *Tank Car* debt.

loan after application of the value of the reclaimed Tank Car assets.

In assessing this argument it must be remembered that the issue of damages was reserved for a later trial by stipulation of the parties and that judgment for the defendants cannot properly be entered unless it is clear from the record that Rushton cannot prove any damage.

In this context, there are two difficulties with defendant's theory. First, the record does not establish the earnings prospects of Old Railcar. Given the character of its business, it is possible that its prospects for future earnings can be established with some certainty and that those prospects might have caused a willing purchaser to invest substantial value.[82]

Second, DIC's argument is premised in large part on the assumptions that the Tank Car debt secured by the Old Railcar stock amounted to over $120,000 and that Rushton is foreclosed by principles of *res judicata* or collateral estoppel from contending that more than $59,000 was recovered by DIC as a result of the foreclosure on the Tank Car assets.[83] It is not at all clear on this record that either of these assumptions is a valid one.

The Loan Agreement Amendment of June 24, 1970 recites that the Tank Car loan from DIC under the March 31, 1968 Loan Agreement had been paid down to $66,600 and that the purpose of Tank Car and DIC in entering the 1970 Amendment was "to secure further the outstanding loan balance." Arguably other language in the Amendment evidences an intent to grant a security interest in Tank Car's inventory and equipment to cover other liabilities of Tank Car to DIC, but the Amendment does not refer to Rushton's Old Railcar stock which was pledged in March of 1969 to secure only the then outstanding balance under the March 31, 1968 Loan Agreement.

Accordingly, it would appear on this record that Rushton's Old Railcar stock had not been pledged to secure the entire liability of Tank Car to DIC which admittedly amounted to $121,000 in January of 1971. The parties have not addressed themselves in the briefing to what this means in the context of determining the value of Rushton's interest in his Old Railcar stock in the Spring of 1973 and it is unnecessary to decide the point at this time. It is sufficient to observe that $121,000 is, in all likelihood, not the appropriate figure to use for the amount of the secured debt in making the necessary evaluation.

In considering the second assumption inherent in DIC's argument, it is necessary to understand Rushton's position on the eve of the hearing on the reclamation petition and the nature of that proceeding. DIC had possession of Rushton's Old Railcar stock as security for at least a portion of the defaulted Tank Car debt. At that time DIC had a security interest in the Tank Car equipment and inventory covering this same debt. DIC, under the UCC, had a right to possession of this other collateral (6 Del.C. § 9–503) and the right to foreclose upon it, after appropriate notice, by sale or by taking the collateral (after obtaining possession of it) in full satisfaction of the Tank Car debt. If DIC were to elect to sell the Tank Car collateral, Rushton had the right to have the proceeds of that sale applied in reduction of DIC's security interest in the Old Railcar stock.

■ These were the positions of the parties when DIC brought on its reclamation petition to secure possession of the Tank Car collateral. This petition was in the nature of a replevin action. *General Phonograph Corp. v. Fanning*, 6 F.2d 115 (3rd Cir. 1925); 2 *Collier, Bankruptcy* § 23.11, 4A Ibid. § 70.39. It was an *in rem* proceeding which placed before the Bankruptcy

---

**82.** The Court does not, of course, so hold at this time. All that is necessary at this stage is to find that such a possibility has not been negated with certainty. The record suggests that capitalization of the past earnings may not be a realistic basis of evaluation. Clearly, the parties anticipated that Old Railcar's business might attract substantial capital investment when they prepared the Prospectus of February 1, 1971.

**83.** Def. Main Br. pp. 28–33.

Referee the issue of whether DIC had a right to immediate possession of the Tank Car equipment and inventory. If there had been a default and DIC had a valid security interest, the Referee had an obligation to grant the petition unless there appeared to be some equity which, in fairness to the bankrupt or any of its creditors, called for some other feasible disposition of the property consistent with DIC's security interest. *See, e. g., In re Yale Express Systems, Inc.,* 370 F.2d 433 (2nd Cir. 1966); 4A *Collier, Bankruptcy* § 70.39. In response to DIC's claim, Rushton initially asserted that there was no valid security interest and that the value of the collateral so far exceeded the secured debt that DIC's security interest was not presently in jeopardy. After Rushton withdrew his opposition and, in effect, consented to the surrender of the collateral to DIC, the Referee determined that DIC had a valid security interest, that a forced sale of the equipment and inventory would be unlikely to benefit the bankrupt or its creditors, and that the inability of the Trustee to safeguard the property might jeopardize DIC's interest if it were not given immediate possession.

■■ The normal rules of *res judicata* and collateral estoppel apply to decisions of bankruptcy courts. *Katchen v. Landy,* 382 U.S. 323, 334, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). A proceeding *in rem* is a proceeding to determine interests in property and a judgment is conclusive on the participants with respect to their interest in the property which is the subject matter of the proceeding. Accordingly, in a proceeding of the kind here involved, "*res judicata* operates as a bar to all legal theories that were presented or might have been presented, but only as they affect or might have affected rights or interests in the property of the debtor. The decision [of the bankruptcy court does not, however] . . . purport to decide any *in personam* rights". *In re Four Seasons Securities Laws Litigation,* 370 F.Supp. 219, 231 (W.D.Okl.1974).

■ Collateral estoppel, on the other hand, bars a party to a reclamation proceeding from thereafter litigating any question of fact which was in fact litigated and adjudicated against him by the bankruptcy court. The issue, however, must have been one which was actually litigated and one which was essential to the decision, not one of "those that merely lurk in the record before the court". *In re Four Seasons Securities Laws Litigation, supra,* at pp. 232–35.

The difficulty with DIC's argument in this case is that Rushton here seeks to vindicate an interest in Old Railcar stock. He does not assert a property interest in the Tank Car assets which he could have asserted in the reclamation proceeding, or which the bankruptcy court held he did not have. While Rushton, as an unsecured Tank Car creditor, had a possible defense to the reclamation petition by way of asserting that there was no valid security interest or that there was equity for unsecured creditors, he had no defense to that petition by virtue of his interest in his Old Railcar stock. His right to have anything realized by DIC from a foreclosure on the reclaimed assets applied in reduction of DIC's security interest in the Old Railcar stock was simply no defense to DIC's claim to immediate possession of those assets. While it is true that the bankruptcy court considered the salvage value of the Tank Car equipment and inventory, it did so solely in the context of weighing any interest of the bankrupt's creditors in the assets against possible prejudice to DIC from withholding possession. The court protected the interests of the creditors and the bankrupt estate by requiring releases,[84] but it is clear from the record that it never focused its attention on Rushton's interest in the Old Railcar stock and did not in fact determine any issue regarding the right Rushton here asserts to an equity interest in that property.[85]

---

84. I do not, of course, suggest that the bankrupt estate or the bankrupt could assert any equity interest in the Tank Car assets after the reclamation order.

85. While DIC does not assert that Rushton is estopped by the November 1972 settlement agreement, the same rationale would answer such an argument. Rushton agreed to drop his

It follows that DIC breached its duty to Rushton with respect to his Old Railcar stock, that the damage phase of this litigation will necessarily entail a determination of the value of Rushton's interest in that stock at the time of the conveyance of the Old Railcar assets in the Spring of 1973, and that Rushton will not be foreclosed in that trial from contending that DIC realized more than $59,000 [86] from the Tank Car equipment and inventory.[87]

## II. RUSHTON'S CLAIM AGAINST THE OTHER DEFENDANTS WITH RESPECT TO HIS OLD RAILCAR STOCK.

In addition to DIC, Rushton claims that Thomas Shea, Helen Markward, Thomas Cahill, TCS, and New Railcar are also liable for the damage he claims to have suffered with respect to his Old Railcar stock. The theory behind these claims seems to be conspiracy.[88] I conclude that these claims should be denied.

The record is devoid of any evidence that defendants Thomas Cahill and Helen Markward had anything to do with the conversion of Rushton's Old Railcar stock or the

failure to accord him his rights under the Uniform Commercial Code. The same is true of TCS and New Railcar.[89]

■ Clearly the moving force behind the events we have reviewed was DIC and Thomas Shea acting on its behalf.[90] As a matter of law, a corporation and one of its officers acting solely on behalf of the corporation cannot be guilty of a conspiracy. E. g., *Coulbourne v. Rollins Auto Leasing Corporation*, 392 F.Supp. 1198 (D.Del.1975); *Bull v. Logetronics, Inc.*, 323 F.Supp. 115 (E.D.Va.1971); *Nelson Radio & Supply Co. v. Motorola*, 200 F.2d 911 (5th Cir. 1952).

## III. RUSHTON'S CLAIM AGAINST NEW RAILCAR WITH RESPECT TO CARS DRLX 2006–2009.

New Railcar received the assets and rights and assumed all of the obligations of Old Railcar. Accordingly, it is currently receiving rentals from the users of cars DRLX 2007–2009 [91] and concedes that it owes Rushton $44,454.75 in back rentals. New Railcar denies, however, that Rushton is entitled to have these railcars or their value restored to him, along with the back rentals.

---

opposition to the reclamation petition and, in effect consented to DIC's taking possession of the assets. He did not release his right to have the proceeds of any foreclosure of those assets applied against DIC's security interest in the Old Railcar stock.

**86.** While DIC utilized this figure in its brief by way of illustration, it is likewise not foreclosed from contending that it realized less.

**87.** In the course of considering the issues currently before the Court, two legal questions have occurred to me which may have some impact on the course of the damage trial and which I would like to have help on before it commences. Was Rushton entitled to prior notice of the sale of the Tank Car equipment and inventory in January of 1972? See 9–105(1)(d), 9–112, *T & W Ice Cream, Inc. v. Carriage Barn Inc.*, 107 N.J.Super. 328, 258 A.2d 162 (1969); *Hepworth v. Orlando Bank*, 323 So.2d 41 (Fla.App.1975). If so, under Delaware law, does the failure to give notice preclude DIC from asserting a deficiency or at least place upon it the burden of showing that the value of the foreclosed collateral was less than the debt? See *Commercial Credit Corp. v. Swiderski*, 195 A.2d 546 (Del.Super.1963);

*Bender, UCC Serv.* § 8.06[2]; *White & Summers, Uniform Commercial Code § 26–15.*

**88.** Rushton's brief also refers to breach of fiduciary duty on the part of defendant Shea. If there be such a claim, it is a derivative one held by Old Railcar which has not been asserted in this case and which would appear to be inconsistent with Rushton's claim to the value of his stock prior to the transfer of the Railcar assets.

**89.** Rushton does not now seek to trace the assets of Old Railcar and restore them to that corporation.

**90.** There is no suggestion in this record that Shea had any personal interest in any of the transactions or corporations involved apart from his interest as a stockholder of DIC. While Shea and his family own DIC, Rushton has made no showing which, under Delaware law, would justify this Court in "piercing the corporate veil" of DIC.

**91.** DRLX 2006 was damaged and subsequently sold for its salvage value. Also, approximately $15,000 was received by Old Railcar in settlement of a claim arising out of the damage done.

New Railcar's theory is that the Norman Shea/Old Railcar lease and the subsequent Rushton/Old Railcar lease were not leases at all, but rather financing agreements which created only a security interest in the cars. I do not agree.

Section 1–201(37) of the UCC provides in part:

> (37) "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. . . . Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest" but a consignment is in any event subject to the provisions on consignment sales (Section 2–326). Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

6 Del.C. § 1–201(37).

Section 9–102 also provides that Article 9, dealing with secured transactions, applies to "any transaction (regardless of form) which is intended to create a security interest in personal property".

■ Accordingly, the fact that the parties have used lease terminology is not determinative of whether the "lessor" retained ownership or merely a security interest. This does not, however, mean that a Court should not look primarily to the documents evidencing the transaction in order to determine its legal effect. The question is whether the economic consequences of the transactions, as structured by the parties, are consistent or inconsistent with the terminology employed. 1B *Bender, UCC Service,* § 29A.05[1][d].

Norman Shea, it will be recalled, received a bill of sale for the four cars. The record indicates that there is no more formal indicium of ownership common in this area of commerce. On March 12, 1970, Mr. Shea as "Lessor" and Old Railcar as "Lessee" executed a "Car Rental Service Contract". It provided that Shea agreed to lease four designated cars to Old Railcar at a monthly rental of $185 per car for a term of 15 years and monthly thereafter unless terminated by either party on thirty days' notice. The lessor agreed to deliver the cars and the lessee to accept them in the yard of the delivery line. At the termination of the lease, the lessee was committed to "return all of the cars to the lessor in the same good order and condition as the cars were when they were delivered . . . ordinary wear and tear excepted." In the event a default (which included a failure in the payment of rentals) continued for more than ten days, the lessor had two remedies: he could repossess the cars and terminate the lease or he could repossess the cars and relet them, holding the lessee responsible for any difference between the rental price and the amount realized from the new lease.

■ DIC and New Railcar correctly point out that the rental price selected was calculated to allow the lessor to recover the purchase price of the cars over the initial term of the lease with interest at 1% per month. The lessee, accordingly, had an obligation to pay the value of the equipment and this feature of the arrangement is, indeed, characteristic of a sale-and-security-interest transaction. Indeed, this is ordinarily a prerequisite to a finding of such a transaction: it does not compel such a finding, however. 1B *Bender, UCC Service,* § 29A.05[2][a]; 1 *Ibid.* § A.06[1].

■ The distinguishing characteristic of a true lease is that the lessee has an obligation to return the leased item. 1 *Bender, supra,* § 4A.06. The lease before the Court includes such an obligation in unequivocal terms and does not contain any other provisions which render that obligation economically insignificant. There is no option to repurchase at the termination of

the lease for a "nominal" consideration or, indeed, any consideration. Nothing provides, directly or indirectly, for the acquisition by the lessee of any equity interest in the cars. And it seems apparent from Old Railcar's "basic plan of operation" that the 15 year term of the lease does not approximate the useful life of the cars.[92] In short, there is no provision for Old Railcar to ever obtain ownership or the practical equivalent thereof. Accordingly, I conclude that the Shea/Old Railcar Car Rental Agreement was a true lease and did not merely create a security interest in Norman Shea.

It is true that this Agreement was not the only document which changed hands between Shea and Old Railcar. Shea was also sent a note payable in the amount of the $65,200 purchase price of the cars payable in one year. The accompanying letter indicated a side agreement that Old Railcar had the right to "redeem the ownership of these cars at any time within one year . . . by payment of the principal amount of $65,200 plus interest at 1% per month and thereafter pursuant to a negotiated price to be defined". The letter also stated that the note evidenced Old Railcar's intent to pay the entire purchase price plus interest within twelve months.

It is clear from these documents that the parties to the Shea/Old Railcar transaction intended Old Railcar to have a purchase option that they anticipated it would exercise this option within a year. This still, however, did not result in New Railcar's acquiring equity in the cars or render its obligation to return the cars economically insignificant. The option was legally enforceable for only a year and did not provide for an application of rental payments against the option price.

But whatever effect the side agreement had on the arrangement between Norman Shea and Old Railcar, when Old Railcar found itself unable to exercise the option and Thomas Shea brought Rushton into the picture in January of 1971,[93] there is no persuasive evidence that this side agreement was struck with him. The sole documents evidencing the transaction are the invoice delivered by Norman Shea and a "Car Rental" agreement delivered by New Railcar containing terms identical to those already described. Nothing evidences the repurchase option and, indeed, given the circumstances which brought Rushton into the transaction, an option to purchase during the period from January 12, 1971 to March 12, 1971 would have been virtually meaningless. I am satisfied that Rushton believed he was acquiring ownership of the four railcars and that this belief was amply justified based upon the lease agreement which New Railcar executed and delivered to him.[94]

It follows that Rushton owns cars DRLX 2007 through 2009 and, at a minimum, is entitled to their return at the expiration of the fifteen year term. The question of whether he is entitled to their immediate return and immediate payment of back rentals remains for decision.[95]

DIC and New Railcar contend that there has been no breach of the lease and that Rushton is not presently entitled to the back rentals because Rushton was a party to the DIC/Old Railcar Agreement of December 19, 1969 and, under that Agreement, DIC is entitled to have all indebtedness of Old Railcar to DIC paid off before any rentals are paid to Rushton. Under this theory, Rushton's rentals are said to be "subordinated" to New Railcar's debt to DIC and will not be due and payable until

**92.** See also DX 26, pp. 5, 12, suggesting a thirty year useful life.

**93.** T. 208.

**94.** Thomas Shea testified upon deposition that Rushton owned these cars. T. 263–64. At the same time, it is true that Old and New Railcar in their own internal records treated these four cars as being owned by them. This extrinsic evidence, however, cannot override the economic reality of the transaction structured by the parties in the governing instrument.

**95.** New Railcar has not briefed the question of how the events pertaining to car DRLX 2006, which was damaged, affect the appropriate relief and that question, therefore, will be reserved for the damage proceedings.

1988.[96] This theory is difficult to comprehend, and I am convinced that it is unsound.

The grant to DIC of a security interest in Old Railcar's assets and accounts receivable clearly did not, in and of itself, have the effect of deferring the rentals due under Rushton's lease. The same can be said of DIC's right under the Agreement to insist that collections on accounts receivables, presumably including all lease income from the users of Old Railcar's cars, be paid to it in satisfaction of its loan. This seems clear not only from the face of the Agreement but also from the fact that rentals were in fact paid on the Rushton lease until July of 1971. For want of any other explanation of the contention of DIC and New Railcar, I assume the argument is that Rushton tacitly agreed that, if and when DIC laid claim to the lease income attributable to his four cars, Old Railcar's obligation to pay him rentals would somehow be deferred.

I have some difficulty finding any basis in the documents for this argument, but, in any event, it is clear from the record that DIC never exercised its right to have lease income attributable to Rushton's cars applied against the Old Railcar indebtedness to DIC. These collections were placed in Old Railcar's general account and used in the ordinary course of its business both during the period when rental payments were being made on the Rushton lease and after those payments were terminated.[97]

Since there is no dispute that Rushton has received no rentals since July of 1971, it follows that the lease has been breached and that Rushton is entitled to repossess the cars, if he so elects, in accordance with the terms of the lease. He is likewise entitled to payment of back rentals.

## IV. RUSHTON'S CLAIM AGAINST DIC AND SHEA WITH RESPECT TO THE DECEMBER 15, 1971 SUIT.

█ Finally, we come to the question of the legitimacy of DIC's December 15, 1971 lawsuit against Dr. Rushton. The parties agree that the relevant law is that of Pennsylvania. Since Rushton's claim and evidence are directed to a wrongful *initiation* of legal proceedings, the relevant Pennsylvania authorities are those involving the tort of "malicious use of process".[98] A claim for malicious use of process is established under Pennsylvania law when the plaintiff proves that:

1. The defendant initiated a civil proceeding against the plaintiff.

2. That proceeding was instituted without "probable cause".

3. Defendant initiated the proceeding with "malice".

4. The proceeding terminated favorably to the plaintiff.

5. There has been an interference with plaintiff's property.[99]

█ It is, of course, clear that a court proceeding was commenced against Dr. Rushton which resulted in an interference with his property. It is also clear that the proceeding terminated favorably to Dr. Rushton.[100] The key issues thus are the matters of "probable cause" and "malice".

█ Probable cause has been defined as "reasonable ground for an honest belief . . . of the defendant in the validity of

---

**96.** 1988 is the due date of the $288,000 New Railcar notes to DIC issued under their June 20, 1973 Loan Agreement. The Court knows of no theory under which Rushton arguably subordinated his rights under his lease agreement to the rights of DIC under this Agreement.

**97.** T. 155–58, 196–98, 259–60.

**98.** As contrasted with those involving the tort of "malicious abuse of process". *Baird v. Aluminum Seal Company,* 250 F.2d 595, 600 (3rd Cir. 1958) (and cases cited therein).

**99.** *Ibid.*

**100.** PX 21. It is questionable whether a showing of a favorable termination is required in an *ex parte* attachment proceeding (ALI *Restatement, Torts* § 677), but, in any event, Rushton's production of a court record showing that the attachment was quashed and the complaint dismissed is sufficient proof of a "favorable" termination. A showing of determination on the merits after trial is not necessary. ALI *Restatement, Torts* § 674.

his cause of action . . .." [101] The test is an objective one.[102] Malice, on the other hand, is a matter of the defendant's subjective state of mind. Malice may, of course, be proved by circumstantial evidence and it may exist even in the absence of hatred or ill will. As the Supreme Court of Pennsylvania observed in *Hugee v. Pennsylvania R. Co.*, 376 Pa. 286, 101 A.2d 740, 743 (1954):

> . . . Malice may be *inferred* from want of probable cause. *Taubman v. Schulte, Inc.*, 302 Pa. 170, 153 A. 150; *Curley v. Automobile Finance Co.*, 343 Pa. 280, 283, 23 A.2d 48, 139 A.L.R. 1082; *Heisey v. Vansant*, 126 Pa.Super. 373, 375, 190 A. 726; *Hubert v. The Alta Life Insurance Co.*, 130 Pa.Super. 277, 196 A. 513. Legal malice is not limited to motives of hatred or ill will, but may consist of defendant's reckless and oppressive disregard of plaintiff's rights. 34 Am. Jur. 161, sec. 160; 54 C.J.S., Malicious Prosecution, § 42, and the many cases therein cited.

The "Complaint in Foreign Attachment" verified by defendant Shea on December 20, 1971, alleged that DIC was the holder of three notes of Tank Car, that all three were in default, that Rushton had agreed to subordinate any obligations owed to him by Tank Car to the obligations to DIC evidenced by these notes, and that DIC had made demand on Rushton for the balance due on the notes. It concluded with a demand for judgment in the amount of $59,000, plus interest.

At trial, defendant Shea was unable to coherently explain why, as he claims, he believed that Rushton was indebted to DIC on December 20, 1971.[103] The facts known to him at the time are clear, however.

From 1962 through March 14, 1967, Rushton from time to time advanced money to Tank Car and received notes in return. In each instance, Rushton signed a letter which recited the advance and agreed (1) to subordinate it and all prior advances to the payment in full of Tank Car's indebtedness to DIC [104] and (2) not to accept any payments from Tank Car other than interest until DIC was paid off. The first eight of these letters expressly referred only to currently existing Tank Car debts to Rushton. While not as clear, the final letter of March 14, 1968, when read as a whole, seems to have been intended to refer to the then-existing Tank Car debt to Rushton of $36,800.

In 1970, Tank Car needed $75,000 and Rushton and DIC agreed to supply $37,500 each. In the words of defendant Shea:

> Delaware Valley Factors offered both of us the opportunity to channel that money into the corporation through the umbrella of Delaware Valley Factors as the prime secured party in relationship to [Tank Car]. Dr. Rushton took advantage of that opportunity and Delaware Investment Company could not by virtue of federal restrictions that we cannot lend money for relending. . . . We had to loan to the direct party.[105]

The "umbrella" here referred to was created, at least in part, by a Subordination Agreement of June 1, 1966 in which DVF, DIC and Tank Car agreed that Tank Car would not make any payment on its indebtedness to DIC so long as anything was owing to DVF.[106]

---

**101.** *Baird v. Aluminum Seal Company, supra,* 250 F.2d at 601.

**102.** *Id.*

**103.** A reorganized, though fair, paraphrase of his testimony is as follows:

Rushton had, on March 14, 1967, subordinated all his claims against Tank Car—whenever arising—to DIC's claims against same. The money which Rushton had given to Delaware Valley Factors in exchange for DVF bonds had, in reality, been given to Tank Car; in seeking to retrieve this money from DVF,

Rushton was in essence recovering it from Tank Car. Since, at the time of the second attachment action Tank Car was still indebted to DIC on three promissory notes with total outstanding unpaid balances of $59,000, Rushton's recovery of his bond money from DVF was a breach of the subordination agreement.

**104.** DX 8, 9, 11, 13, 14, 15, 16, 17 and 19.

**105.** T. 303.

**106.** DX 18.

As earlier noted, DIC expressly released Rushton, in November of 1971, from personal liability on Tank Car's notes to DIC.

On December 8, 1971, the Referee in Bankruptcy, recognizing the priority of DVF's liens, required DIC to secure a release from DVF, and DIC apparently paid at least $27,500 to DVF for this purpose.

With this knowledge, Shea caused DIC to file its Pennsylvania action one week later claiming that Rushton was liable for the unpaid balance on Tank Car's debt to DIC.

■ On these facts, I conclude (1) that there was no reasonable basis for a belief that the $37,500 advance of DVF to Tank Car in 1970 was subordinated to Tank Car's DIC indebtedness under any of Rushton's subordination letters and (2) that, even if there had been a reasonable basis for such a belief, this still would have provided no reasonable basis for a belief that Rushton was liable for the $59,000 balance of the Tank Car indebtedness to DIC. Accordingly, there was no probable cause for the institution of DIC's foreign attachment action.

The question of Mr. Shea's subjective intent remains. It is apparent to me that Shea attributes the failure of Tank Car to internal squabbling between Rushton and Markward and that a good deal of heat was generated between Shea and Rushton during the events of 1971. It is further apparent to me that Mr. Shea has considerable expertise and sophistication in the field of finance, creditors' rights, and subordination agreements. Given this background, the November release of Rushton from personal liability, and Shea's acknowledgment that the whole purpose of the Rushton/DVF/Tank Car transaction was to

bring the $37,500 debt under the umbrella of DVF's prior secured position, it is apparent to me either that Mr. Shea knew when he signed his affidavit that the DIC claim had no merit or that, his frustration with the Tank Car bankruptcy and his irritation with Rushton caused him to act without any regard to the merits of the claim or Rushton's clear rights. In either event, I believe that Pennsylvania law entitles Rushton to whatever damages he can prove as against both DIC and Shea.[107]

## CONCLUSION

■ In summary, I conclude (1) that DIC has breached its duty to Rushton with respect to his Old Railcar stock, (2) that Old and New Railcar have breached their respective duties to Rushton with respect to railcars DRLX 2006–2009, and (3) that DIC and Thomas Shea have breached their respective duties to Rushton with respect to the second Pennsylvania foreign attachment action. If actual damages[108] are proved in support of Rushton's claims against these defendants, judgment will be entered against them accordingly. Judgment will be entered in favor of the remaining defendants.

Submit order.

---

**107.** As to Shea, see ALI, *Restatement, Torts* § 674, Comments (a) and (b).

**108.** Rushton's claim for punitive damages will be denied. The primary purpose of an award of punitive damages is to serve the public interest in deterring future illegal conduct by the defendant or others similarly situated. *Morris v. Board of Education*, 401 F.Supp. 188, 215 (D.Del.1975). Given the background of this matter, I conclude that an award of punitive damages is not necessary for this purpose.